Filed 11/15/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CENTRAL LABORERS' PENSION FUND, | H039508 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. Nos. CV180413, CV180420, CV180597, CV180928) |
| v. | |
| MCAFEE, INC. et al., | |
| Defendants and Respondents. | |

This is a class action brought by former public shareholders of security technology company McAfee, Inc. Intel Corporation acquired McAfee in a cash sale at $48 per share for a total of $7.68 billion (merger). Plaintiff Central Laborers' Pension Fund (plaintiff), on behalf of itself and the class, alleges that McAfee, Intel, and the former members of McAfee's board of directors—comprised of nine outside directors and the former president and CEO, David DeWalt (together defendants)—engaged in an unfair merger process contaminated by conflicts. Plaintiff claims that in pursuit of his own self-interest, DeWalt withheld material information about negotiations with Intel management from McAfee's board of directors, whose members failed to safeguard the process and who consequently approved an undervalued price per share. Plaintiff also claims that defendants omitted material information from the merger proxy statement on which McAfee's public shareholders relied in voting for the merger.

The trial court, applying Delaware law, granted summary judgment for defendants. The court found no triable issue of material fact regarding the individual defendants' alleged breaches of fiduciary duty, and concomitantly no liability on behalf

of McAfee and Intel for aiding and abetting. Plaintiff challenges the summary judgment as well as an earlier order setting the matter for a trial to the court without a jury.

For the reasons stated herein, we affirm the judgment as to the nine outside director defendants and reverse the judgment as to DeWalt and the corporate defendants.

# I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

## A.   FACTUAL OVERVIEW

### 1.   The Company

McAfee was founded in 1989 as a Delaware corporation with headquarters in Santa Clara. At the time of the merger, it was the world's largest dedicated security technology company. David DeWalt joined McAfee in 2007 as president and CEO and served on the board of directors, bringing about 15 years of executive experience in the software industry, including the sale of a company under his leadership. DeWalt's reputation according to one investment bank's analysis was "for building and subsequently selling businesses."

---

[1] Portions of the record and the parties' briefs on appeal were filed under seal pursuant to this court's orders of June 25, 2014, November 25, 2014 and June 18, 2015. Having determined that the facts relevant to our decision on the appeal are no longer subject to an "overriding interest that overcomes the right of public access" to the records (see Cal. Rules of Court, rule 2.550(d); *NBC Subsidiary* (*KNBC-TV*), *Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1222, fn. 46), we informed the parties on October 19, 2017, of the court's intent to unseal the appellate record. We have considered the filed response of defendants Intel and McAfee, which indicates no opposition to the unsealing of the record currently before this court. Accordingly, concurrent with the filing of this opinion, we hereby order the records previously filed under seal by orders dated June 25, 2014, November 25, 2014, and June 18, 2015, to be unsealed in their entirety. (Cal. Rules of Court, rule 2.551(h).) The unsealing of these records does not affect any continuing obligations of the parties under the trial court's October 22, 2010 Stipulated Confidentiality Order, as amended and supplemented, such as with respect to information produced during discovery and designated confidential, or to other intellectual property and trade secrets not contained in the previously-sealed records on appeal in this case.

The nine other members of the board—defendants Charles Robel, Carl Bass, Thomas Darcy, Leslie Denend, Jeffrey Miller, Lorrie Norrington, Denis O'Leary, Robert Pangia, and Anthony Zingale—were outside, nonmanagement, nonemployee directors with combined executive and board experience in the technology, investment banking, and accounting fields, including dozens of merger and acquisition transactions. None of the independent directors joined Intel as directors or employees after the merger.

McAfee maintained close working relationships and alliances with numerous technology companies. As part of its regular diligence, the board of directors discussed McAfee's strategic relationships with other technology companies along a "full spectrum of options" from technology partnerships to mergers and acquisitions. It was DeWalt's role to update the board on these ongoing discussions, which he did as part of a "regular review process that the board and management went through . . . almost every meeting."

### 2. *McAfee and Intel—Business Relationship and Early Merger Discussions*

Before the merger, McAfee had a nearly decade-long relationship with Intel as a supplier of security software and a partner in research and development and marketing initiatives. In 2009, the companies agreed to collaborate in developing enhanced security technology using the expertise of both companies through a joint research-and-development project called "Patmos." Intel's Software and Services Group, led by the group's general manager and senior vice-president Renee James (James), was around this time also considering potential acquisitions as part of Intel's security strategy, including the possibility of acquiring an existing platform security company such as McAfee.

In March 2010, Intel requested a meeting with McAfee. DeWalt and Gerhard Watzinger, a McAfee executive vice-president, speculated that Intel might want to "beat us up about Patmos" because McAfee had not prioritized the project, leading Intel to complain on multiple occasions that McAfee was not meeting the collaboration

3

deadlines. In an e-mail to James, DeWalt expressed excitement about the opportunities for security products and the potential for "an amazing partnership." DeWalt asked if James had an agenda to propose for the meeting and suggested they "expand slightly and review all key business synergies and financial models," noting that his chief strategy officer and "head of M&A [Watzinger]" would attend. Watzinger prepared a presentation that included one slide each on "key synergies," financial outlook, and "accretive" benefits to revenue and shareholder value. The McAfee employee responsible for the financial outlook slide described it as a "high level," "back of the envelope" and nonexpert view of potential benefits.

James later testified that the McAfee presentation "surprised" her because she anticipated a meeting about the joint development effort. DeWalt testified that the group led by James met "to ask questions about our business in the spirit of partnership, but certainly the questions that were being asked were probably more leading than just a partnership discussion."

After the March 2010 meeting, McAfee and Intel management continued their partnership discussions. Intel began vetting investment banks for advisory services in connection with a potential "deal" in the security sector. At one point Intel offered the advisory position to Morgan Stanley. Morgan Stanley declined, noting internally that it anticipated a more lucrative "revenue opportunity" providing sell-side advice to McAfee.

Meanwhile, DeWalt and James stayed in regular contact, which DeWalt understood as "partner oriented" and indicative of Intel's interest in security and in McAfee. A close collaboration began between McAfee and Intel management in a project that was dubbed "Inca." On April 4, 2010, representatives of both sides met at Intel's headquarters. The objective of the Inca meeting was to provide Intel with "necessary McAfee and technology background to build synergy matrix and [financial] model" and to "[i]dentify top opportunities for combined assets." The discussion centered on a list of eight joint business opportunities, including Patmos, that each

4

represented a "$1B+ opportunity." Inca discussions continued throughout April and May 2010. McAfee added a segment-by-segment analysis of business opportunities to Intel's technology asset list, highlighting McAfee's "value-add" in terms of the eight "Billion Dollar" ideas. In early and mid-May 2010, Intel sent detailed inquiries to McAfee on monetization, joint market penetration, and McAfee's growth strategy and revenue direction.

In May and June 2010, James proposed to Intel's board of directors that Intel engage in acquisition discussions with McAfee. Intel's internal valuation analyses of McAfee as presented to the Intel board of directors in June 2010 reflected a range of values from a standalone price per share of $42 to as high as $56 to $90 per share for "strategic synergies" from an acquisition. The Intel board of directors approved an acquisition offer range of $45 to $49 per share.

### 3. June 11 Proposal at $45 per share

James met with DeWalt on June 10, 2010 and verbally conveyed Intel's interest in making an offer at the price of $45 per share. DeWalt recalled it as the "first meeting . . . where there was a strong indication of interest and that there might be an offer to follow." DeWalt's response to James was "if it didn't start with a five, it was a non starter." James later testified that "Dave [DeWalt] let me know 45 didn't work. . . . Dave's words were: It needs to start with a 5."

The next day, James sent DeWalt a written request for exclusive negotiating rights and nonbinding proposal to acquire McAfee in a cash offer at $45 per share (June 11 proposal) subject to the completion of due diligence and board and regulatory approvals. The proposed price represented a 43 percent premium over McAfee's stock price, which had fallen since late 2009 and was trading in the low 30s. The June 11 proposal stated that Intel intended to operate McAfee as a standalone subsidiary and to retain "the current management team." DeWalt notified McAfee board chairman Robel, who called a special meeting for the next day.

5

In an e-mail to Intel's CEO and board subcommittee dated June 11, 2010, James reported "preliminary progress" with McAfee and stated that DeWalt had requested a nonbinding letter of intention to enter into due diligence despite "a price gap to their potential expectations . . . ." In a follow-up exchange with Andy Bryant (of Intel), James stated that DeWalt's "expected price" was "50." Bryant responded that a deal was possible "if that is where he is starting." James also recounted the meeting to her Intel colleague Donald Harbert, whose notes indicate that James believed the "gap is $5.00" between Intel's indication of interest at $45 and McAfee's expectations for an opening bid. Harbert's notes indicate that McAfee's stock price was "down" and Intel should make an offer "now before the stock goes up." The notes also reference a retention plan for the "top 41" and that DeWalt would "only want to stay 2 years."

### 4. McAfee's Response to the June 11 Proposal

The McAfee board was informed of ongoing joint partnership discussions between Intel and McAfee in the spring of 2010. Several board members testified that Intel had indicated "a stronger interest in security" and a "greater interest beyond the partnering development deal" or product development relationship that "could have the potential to turn into something."

Yet several directors described Intel's June 11 proposal as unexpected and a surprise, based on views that Intel was not a likely acquirer and that DeWalt's briefings about discussions with Intel had remained focused on the joint venture. Defendant Robel explained that he thought Intel's increased interest in security and questions about McAfee's business might have been a "fishing expedition" because a combination with Intel was "pretty out of the box." The board members were not aware of project Inca and management's detailed analysis of potential synergies that could be developed in an Intel acquisition. Robel testified that before the June 11 proposal, the board had not placed a view on a value of the company in a sale "because the board hadn't even considered putting the company in play."

6

The McAfee board met in formal sessions nine times following receipt of the June 11 proposal. At the first special meeting on June 12, 2010, DeWalt reviewed McAfee's relationship with Intel and updated the board on the partnering discussions that had taken place since late February 2010. DeWalt told the board that he believed Intel could be convinced to increase its price per share following initial due diligence. The board at that time retained transactional counsel, Wilson Sonsini, and considered several investment banks to serve as McAfee's financial advisor, ultimately selecting Morgan Stanley. The terms of engagement tied Morgan Stanley's compensation to the acquisition price and provided a higher fee for each per-share increase in sale price, with a multi-million dollar bonus for a price equal to or greater than $50 per share and a bonus of several times that amount for a sale at $55 per share or more.

McAfee's board reconvened several days later for an update on the due diligence sessions and McAfee's internal forecast. Morgan Stanley offered its preliminary analysis of the July 11 proposal in view of McAfee's financial performance, possible standalone scenarios, other potential bidders, and Morgan Stanley's valuation of McAfee at between $55.09 per share (base case) to $60.20 per share (high case). Following these discussions, the board decided to reject the June 11 proposal and directed DeWalt to communicate to Intel that $45 per share was inadequate. The focus of the board was to obtain an offer at a price that was "something above $50." According to defendant Lorrie Norrington, the board "had the specific conversation that 45 was too low and that . . . it has to start with a five in order for the board to consider the offer."

DeWalt and Morgan Stanley separately communicated McAfee's rejection of the $45 offer. DeWalt testified that there was "an impasse" because "Intel wouldn't accept anything that started with a five and we wouldn't accept anything that didn't start with a five . . . ." James similarly recalled that DeWalt told her "that he thought it needed to be in the mid 50s. Fifty-two to 54." James's internal communications with Andy Bryant reflected this understanding of McAfee's position as well, based on conversations with

DeWalt and on communications between the financial advisors and legal counsel. In an e-mail exchange on June 30, James told Bryant that DeWalt had been unwilling to affirm a price "other than he would work to get his board to say 'they would do 50' . . . and we know some of the board is at 52-55." Bryant advised James to not go to Intel's board of directors for increased authorization "unless we know 50 is ok."

James spoke with DeWalt over the July 4th weekend and asked "will 50 get the deal done, if we go back to the board?" DeWalt, according to James, "said, no, 52 to 54. He stuck to it." James explained that she did not speak with DeWalt for "a couple weeks after" and decided to wait until the second quarter results, noting that McAfee was "in a falling market, their stock was going down, and we knew their quarter wasn't good. So we said: You know what? We see real weaknesses in their business. And we were concerned that we needed to wait and get more data."

Correspondence continued between James and DeWalt immediately following the July 4th weekend. DeWalt provided Intel with McAfee's preliminary second quarter results, which he described to James as "very strong," adding "Renee, I'm hoping this is exactly the type of 'good new news' that might help move things forward on your end." The view internally was more subdued. DeWalt testified the results were "mixed" with McAfee having "missed pretty substantially" analyst expectations in a few key categories but having beat expectations in others. Robel explained that "we believed, and the Street believed, it was not a good quarter. And it was not . . . there was a cloud around the company's ability to grow in the future." James also recalled McAfee's second quarter results as being "weak" with "very weak forward guidance."

McAfee's board met again on July 8, at which time DeWalt reported a pause in the merger discussions as Intel wished to wait until the full financial statements from McAfee's second quarter became available. Morgan Stanley confirmed DeWalt's information and reported that they had reiterated that Intel would need to increase its $45-per-share offer before McAfee would engage in more complete due diligence.

Morgan Stanley also reported that one other potential acquirer identified by the board had indicated that it was not interested in pursuing an acquisition. DeWalt apparently did not inform the board about James's inquiry if $50 would "get the deal done" if she went back to Intel's board.

### 5. *Revised Offer at $48 per share*, *Merger Agreement*, *and Proxy Statement*

Intel revised its acquisition offer to $48 per share in a letter dated July 19 and delivered to DeWalt on July 20. The offer represented a 58 percent premium over McAfee's stock closing price on July 19 and demanded a 30-day exclusivity agreement.

McAfee's board convened special meetings on July 21 and July 22 to discuss the revised offer. DeWalt reported that based on his discussions with James, Intel "was not willing to further increase its offer" price. Morgan Stanley reported that it had received similar information from Intel's financial advisor and that it believed Intel would withdraw its offer if McAfee sought alternative bids or failed to agree to a 30-day exclusivity period. Morgan Stanley presented a valuation summary and the board discussed the conditions of the offer, market trends for mergers and acquisitions, the interest and ability of other potential acquirers to complete an acquisition, and whether to seek a further increase in the offer price. DeWalt reviewed the second quarter financial results and reasons that revenues had fallen below expectations, as well as several successes that McAfee had achieved that quarter. At the end of the meeting on July 22, McAfee's board authorized negotiations based on the $48-per-share offer but directed counsel to seek a shorter term of exclusivity.

The McAfee board held three special meetings in August to consider aspects of the proposed transaction. DeWalt's compensation and employment agreement with Intel also was negotiated and reviewed by the board's compensation committee. At the meeting on August 18, Morgan Stanley delivered a formal fairness opinion concluding that the acquisition price of $48 per share was "fair from a financial point of view" to the

9

shareholders.  The board approved the merger on August 18, 2010.  On August 19, Intel and McAfee jointly announced an agreement for Intel to acquire all of McAfee's common stock for $48 per share in cash.  The merger agreement included a "fiduciary out" clause that permitted McAfee to terminate the deal if it received a better offer unsolicited.

The proxy statement dated September 21, 2010, described in relevant part the McAfee-Intel joint partnership (Patmos) in 2009 and the meeting between James and DeWalt on June 10, 2010.  It described McAfee's process, price negotiations, and communications with Intel between the June 11 proposal at $45 per share and receipt of the revised offer on July 20 at $48 per share, as well as Morgan Stanley's fairness opinion and the board's deliberations and consideration of alternative prospects before approving the agreement on August 18.  It did not mention project Inca or pre-due diligence discussions or exchanges prior to the June 11 proposal.  It also did not mention any $50 per share "overture" but stated that on June 26, James and DeWalt "agreed to revisit valuation discussions at a later date" after DeWalt had indicated that McAfee's board would not be interested in accepting an offer below $50 per share, and James had responded that Intel's board would not support an offer price of $50 per share.  The proxy statement summarized details of the merger agreement, including the $230 million termination fee, nonsolicitation ("no shop") provision, "fiduciary out" provision, and DeWalt's and other executive's employment agreements.

No other company expressed interest in purchasing McAfee following the merger announcement.  On November 2, 2010, McAfee's shareholders approved the merger, with 99.9 percent of voting shares in favor.

**B. PROCEDURAL HISTORY**

This class action consolidated several lawsuits filed in the Superior Court of Santa Clara County in August 2010[2] after Intel and McAfee announced the merger agreement on August 19.  The plaintiffs did not seek a preliminary injunction to prevent the McAfee shareholder vote from going forward.

### 1. Operative Complaint

The operative, consolidated amended complaint (complaint) was filed on January 6, 2011, after McAfee's shareholders voted in favor of the merger on November 2, 2010, but before the deal closed after regulatory approvals.  The complaint asserted a single cause of action for breach of fiduciary duties and aiding and abetting, claiming that the 10 individual defendants,[3] aided and abetted by McAfee and Intel (both Delaware corporations), breached their fiduciary duties of care, loyalty, candor, good faith and independence by failing to ensure a fair process and by depriving McAfee's public shareholders of the true and fair value of their McAfee stock.

The complaint alleged that DeWalt "in particular" acted out of self-interest during the merger process in order to ensure his gains in an acquisition, and that he allegedly kept the other board members "in the dark" throughout the merger process—including by concealing information about management's exchanges with Intel on the value of McAfee's prospects and future products and by effectively "capping" McAfee's price expectations at $50.  The complaint further alleged that the individual defendants, who stood to receive accelerated vesting of their stock upon completion of the merger "at a

---

[2] Two lawsuits also were filed in the Delaware Court of Chancery and consolidated; the plaintiffs in that action voluntarily dismissed their complaints in July 2011.

[3] The individual defendants, as noted in our discussion of the facts, are David DeWalt, Charles Robel, Carl Bass, Thomas Darcy, Leslie Denend, Jeffrey Miller, Lorrie Norrington, Denis O'Leary, Robert Pangia, and Anthony Zingale.

11

value of over $3 million," accepted a "rubber-stamp fairness opinion" by Morgan Stanley regarding the $48-per-share offer.

It alleged that in order to protect the deal with Intel, defendants entered into a merger agreement that was "steeped in preclusive deal protection provisions designed to guarantee that Intel did not lose its preferred position."  These included a " 'No Shop' " provision that required McAfee to discontinue any discussions with other potential acquirers, a " 'Matching Rights' " provision that gave Intel five days to match any competing acquisition proposals that McAfee might receive, and a " 'Termination Fee' " provision in which McAfee would pay Intel $230 million if it accepted a higher offer despite the no shop provision.

The complaint also alleged that defendants withheld material information in proxy statements, depriving McAfee's shareholders of information about the flawed sales process, conflicts of interest that burdened the board and its advisors, McAfee's intrinsic value and prospects going forward, material benefits that defendants and McAfee management would secure only if the acquisition succeeded, and the flawed financial analysis supporting Morgan Stanley's fairness opinion.

The complaint in sum asserted that (1) defendants were motivated by lucrative personal gains, (2) the acquisition price of $48 per share was unfair and undervalued below McAfee management's own estimates, (3) the proxy statements to McAfee's public shareholders omitted material information about the merger process and the basis for Morgan Stanley's fairness analysis, and (4) defendants consequently breached their fiduciary obligation to obtain the highest value reasonably available for McAfee's shareholders.

The trial court overruled demurrers to the consolidated amended complaint on June 29, 2011.

12

### 2. *Trial Setting*

In January 2012, the trial court granted plaintiff's motion to intervene, certified the class, and appointed plaintiff as class representative. Several months later, defendants moved to amend certain pretrial and trial-setting orders to specify that the case would be tried to the court in a bench trial. Defendants argued that plaintiff was not entitled to a jury trial because under Delaware law, breach of fiduciary duty claims are equitable in nature and are subject to the exclusive jurisdiction of the Delaware Court of Chancery, with no right to a trial by jury in that court. Plaintiff opposed the motion and argued, in an effort to secure a jury trial, that although Delaware law applies as to issues of corporate governance, California law mandates the right to a jury trial, as determined by the legal or equitable nature of the claims in the case. The trial court rejected plaintiff's argument that its fiduciary duty claims were legal in nature and granted defendants' motion to amend, setting the matter for a trial to the court without a jury.[4]

In August 2012, the court denied a motion by plaintiff for leave to file a second amended complaint.

### 3. *Summary Judgment*

Defendants moved for summary judgment (Code Civ. Proc., § 473c)[5] on August 3, 2012. Defendants framed the shareholder class action as "no different" from the "rash of lawsuits" that follow most announcements of sale of a publicly traded company and claim that the sale is the product of an " 'unfair process' " at "an 'unfair price.' " Defendants submitted declarations and exhibits in support of the motion and requested judicial notice of certain regulatory filings and of stock prices at time points before and after Intel's acquisition offer.

---

[4] Plaintiff petitioned for review of the trial court's order denying a jury trial. This court summarily denied the petition for writ of mandate on July 12, 2012.

[5] Unspecified statutory references are to the Code of Civil Procedure.

Plaintiff in response raised no evidentiary objections but purported to dispute many of defendants' 185 material facts and raised 153 additional disputed material facts in support of its opposition. Plaintiff argued that triable issues of material fact precluded summary judgment, particularly concerning (1) strategic, informational, and timing disadvantages that McAfee faced in its haste to evaluate an offer that " 'surprised' " and " 'shocked' " the board members (despite McAfee's collaboration with Intel management on project Inca to identify and value strategic synergies), (2) DeWalt's "outright" rejection of James's $50-per-share overture, which allegedly caused Intel to "freeze" discussions at a critical juncture, (3) DeWalt's alleged concealment of the $50-per-share overture and the project Inca discussions from the board, and (4) the board's acceptance of Morgan Stanley's fairness analysis despite obvious reliance on " 'street' " valuations that undervalued the company because they "had no idea about the billions of dollars of additional value uncovered during the Project Inca discussions."

The trial court granted judgment in favor of defendants on November 2, 2012. The court noted there was no dispute that the McAfee charter contained an exculpatory provision pursuant to section 102, subdivision (b)(7) of the Delaware General Corporation Law (8 Del. Code, § 102(b)(7)) shielding the independent directors from monetary liability for breaches of the duty of care.[6] Beginning with the alleged breach of the duty of loyalty, the trial court found that plaintiff failed to raise a triable dispute as to the independent directors. The court cited undisputed evidence that the directors were highly qualified and experienced outside directors who met multiple times throughout the process and retained and relied upon financial and legal advisors. The court found no

---

[6] The exculpatory provision in McAfee's Third Amended and Restated Articles of Incorporation states in relevant part that the directors are "not personally liable . . . for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law . . . ."

evidence that the board had abandoned its oversight function or that DeWalt dominated or controlled the independent directors.  The court reasoned that Delaware law does not necessarily prohibit a board from relying on an interested manager to negotiate a merger and there was no evidence that the transaction was unfair to the corporation or had betrayed some confidential relationship.

Regarding DeWalt, the court found that DeWalt's interest in the merger did not present a disqualifying conflict, particularly because Intel's interest in retaining McAfee management was disclosed in the June 11 proposal, and DeWalt's employment terms were negotiated after the board accepted the $48 price-per-share offer and were approved by the compensation committee.  The court found no evidence that DeWalt's failure to notify McAfee's board about project Inca and the synergy discussions with Intel was the result of self-interest or placed McAfee "at a strategic disadvantage."  The court found that DeWalt's rejection of James's overture of a $50-per-share sale price could not be "reasonably construed as anything but negotiating for an authorized, higher amount, not an effort to drive McAfee's expectations lower," since it was undisputed that DeWalt actually "sought a higher price in the '$52 to $54' range."  The court thus concluded that there was no triable issue regarding DeWalt's alleged manipulation of the disinterested majority of the board.

Having found no triable issues of material fact related to the fiduciary duty claims, the court concluded there was no basis for relief for any alleged disclosure violations and that McAfee and Intel could not be liable for aiding and abetting.  The trial court entered judgment for defendants on February 13, 2013.  Plaintiff timely appealed.

## II.  DISCUSSION

Plaintiff asserts that in deciding the motion for summary judgment, the trial court disregarded its fundamental task to construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  Plaintiff contends that the court drew improper inferences in defendants' favor and granted summary judgment in the face of

15

several triable issues of fact concerning defendants' conduct and the information supplied to McAfee shareholders before the merger vote.  Defendants respond that plaintiff's portrayal of the merger process derives from speculation and guesswork, and is unsupported by evidence sufficient to create a triable issue of material fact.

## A. SUMMARY JUDGMENT AND STANDARD OF REVIEW

A motion for summary judgment provides "a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  The trial court must grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c); *Schachter v. Citigroup*, *Inc*. (2009) 47 Cal.4th 610, 618 (*Schachter*).)  To demonstrate the existence of a triable issue of material fact, the party opposing the motion must present evidence that "would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850.)  In making its determination, "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, [but] it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*." (*Id*. at p. 856.)  The evidence must be viewed in the light most favorable to the nonmoving party. (*Schachter*, *supra*, at p. 618; *Aguilar*, *supra*, at p. 843.)

On appeal from a summary judgment, we "examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)  Defendants as the moving party have the initial burden of showing that one or more elements of the cause of action cannot be established, justifying judgment in their favor. (§ 437c, subd. (p)(2).)  The burden then

16

shifts to plaintiff to demonstrate the existence of a triable issue of one or more material facts. (*Ibid*.) "If the evidence is in conflict, the factual issues must be resolved by trial." (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839.)

## B. PRINCIPLES OF DELAWARE LAW: FIDUCIARY DUTY, THE BUSINESS JUDGMENT RULE, ENHANCED SCRUTINY, AND ENTIRE FAIRNESS

A fundamental principle of Delaware law is that the "ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors." (*Revlon, Inc. v. MacAndrews & Forbes Holdings* (Del. 1986) 506 A.2d 173, 179 (*Revlon*).) Corporate directors have "an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." (*Cede & Co. v. Technicolor, Inc.* (Del. 1993) 634 A.2d 345, 360 (*Cede*).) In a proposed merger or change of control transaction, "the board has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders." (*Unocal Corp. v. Mesa Petroleum Co.* (Del. 1985) 493 A.2d 946, 954 (*Unocal*).) Unless the board determines it is in the corporation's best interest to avoid a change in control, "obtaining the highest price for the benefit of the stockholders should [be] the central theme guiding director action." (*Revlon, supra*, at p. 182.)

"When shareholders challenge actions by a board of directors, generally one of three standards of judicial review is applied: the traditional business judgment rule, an intermediate standard of enhanced judicial scrutiny, or the entire fairness analysis." (*Emerald Partners v. Berlin* (Del. 2001) 787 A.2d 85, 89 (*Emerald Partners*).) Ordinarily, the propriety of director conduct is measured by the business judgment rule. (*Unocal, supra*, 493 A.2d at p. 954.) "The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.' " (*Ibid*.) It "posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by

17

the courts unless it cannot be 'attributed to any rational business purpose.' " (*Cede*, *supra*, 634 A.2d at p. 361.)

In certain circumstances, however, including a sale of control, courts apply "enhanced scrutiny" to the decisions and actions of the directors to ensure that the directors' conduct is "reasonable." (*Paramount Communications v. QVC Network* (Del. 1993) 637 A.2d 34, 42 (*Paramount*).) "The duty to seek the best available price applies . . . when a company embarks on a transaction—on its own initiative or in response to an unsolicited offer—that will result in a change of control." (*Lyondell Chemical Co. v. Ryan* (Del. 2009) 970 A.2d 235, 242 (*Lyondell*).) The directors' obligation in this context is "to secure the transaction offering the best value reasonably available for the stockholders" and to "exercise their fiduciary duties to further that end." (*Paramount*, *supra*, at p. 44; *Revlon*, *supra*, 506 A.2d at p. 182.)

Courts apply "even more exacting scrutiny" when there is evidence of "actual self-interest" that "affects a majority of the directors approving a transaction . . . ." (*Paramount*, *supra*, 637 A.2d at p. 42, fn. 9.) This is the entire fairness standard, which is triggered by rebuttal of the presumption of the business judgment rule and which shifts the burden to the defendant directors to prove the " 'entire fairness' " of the transaction to the shareholders.[7] (*Cede*, *supra*, 634 A.2d at p. 361; *Cinerama, Inc. v. Technicolor, Inc.*

---

[7] Delaware's business judgment rule has procedural and substantive applications. " ' "As a rule of evidence, it creates a 'presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company.' [Citation.] The presumption initially attaches to a director-approved transaction . . . in the absence of any evidence of 'fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment.' " ' " (*Cede*, *supra*, 634 A.2d at p. 360, quoting *Citron v. Fairchild Camera & Instrument* (Del. 1989) 569 A.2d 53, 64 (*Citron*).) A shareholder plaintiff challenging a board decision has the initial burden to rebut the presumption with evidence that the directors, in reaching the challenged decision, breached any one of the fiduciary duties of good faith, loyalty, or due care. (*Cede*, *supra*, at p. 361.) If a plaintiff fails to meet this evidentiary burden, the business judgment rule (continued)

18

(Del. 1994) 663 A.2d 1134, 1162 (*Cinerama*) ["Where . . . the presumption of the business judgment rule has been rebutted, the board of directors' action is examined under the entire fairness standard."].) The concept of entire fairness under Delaware law has two aspects: fair dealing and fair price. (*Mills Acquisition Co. v. Macmillan, Inc.* (Del. 1988) 559 A.2d 1261, 1280 (*Mills*).) " 'Fair dealing' focuses upon the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation." (*Ibid.*) " 'Fair price,' in the context of an auction for corporate control, mandates that directors commit themselves, inexorably, to obtaining the highest value reasonably available to the shareholders under all the circumstances." (*Ibid.*)

In sum, "[w]hen determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review." (*Chen v. Howard-Anderson* (Del. Ch. 2014) 87 A.3d 648, 666 (*Chen*).) "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." (*In re Trados Inc. S'holder Litig.* (Del. Ch. 2013) 73 A.3d 17, 35-36 (*Trados*).)

## C. ANALYSIS

Our review of the grant of summary judgment in this case is closely bound to the applicable standard of review of the challenged transaction under Delaware law. (See *Mills*, *supra*, 559 A.2d at p. 1279 [" '[b]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative . . . .' "].) Plaintiff invokes the entire fairness standard, contending that

attaches as a substantive rule of law to protect the directors and their business decisions. (*Ibid.*; *Citron*, *supra*, at p. 64.) If the business judgment rule is rebutted, the burden shifts to the defendant directors to prove the " 'entire fairness' " of the transaction to the shareholders. (*Cede*, *supra*, at p. 361.)

19

DeWalt's self-interest and the flawed merger process deprived McAfee shareholders of "a 'neutral decision-making body' " due to "the manipulation of the disinterested majority by an interested director." (*Cinerama*, *supra*, 663 A.2d at p. 1170, fn. 25; *Mills*, *supra*, at p. 1279.)

Defendants respond that plaintiff has not satisfied the prerequisites for entire fairness because there is no evidence that a majority of the directors acted out of self-interest (*Paramount*, *supra*, 637 A.2d at p. 42, fn. 9) or were dominated by a minority of interested directors (*Cinerama*, *supra*, 663 A.2d at p. 1170, fn. 25). Defendants analyze DeWalt's and the board of directors' actions under the presumptive standard of enhanced scrutiny. Enhanced scrutiny requires a determination only "whether the directors made a reasonable decision, not a perfect decision." (*Paramount*, *supra*, at p. 45.)

The parties also dispute the effect of the exculpatory provision in McAfee's charter to limit personal liability of any independent directors for breaches of the duty of care. (See 8 Del. Code, § 102(b)(7).)

We begin by analyzing plaintiff's claim for entire fairness review and find that the standard was not met.[8] Accordingly, we review defendants' conduct in the merger proceedings under the enhanced scrutiny standard of review. We find that there are no triable issues of material fact related to the breach of fiduciary duty action against the nine independent directors and affirm the grant of summary judgment in their favor. We find that triable issues remain related to defendant DeWalt's apparent nondisclosure of arguably material information to the board and the shareholders and reverse the grant of

---

[8] Plaintiff does not dispute that defendants met their initial burden under section 437c, subdivision (p)(2). We therefore do not examine the showing in support of the summary judgment motion except insofar as it may be relevant to the discussion.

20

summary judgment in his favor. We also reverse the grant of summary judgment in favor of McAfee and Intel on the aiding and abetting claim.

### 1. *Operative Standard of Review*

As summarized above, the operative standard of review "depends initially on whether the board members (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness)." (*Trados*, *supra*, 73 A.3d at p. 36.) Resolution of this threshold issue turns on whether the evidence, viewed in the light most favorable to plaintiff, supports rebuttal of the presumption that the directors acted in the best interests of the shareholders—either by breach of the duty of loyalty or of the duty of care. (*Cede*, *supra*, 634 A.2d at p. 371.) This requires us to examine whether an alleged breach by an individual director, such as DeWalt, triggers entire fairness review for the actions of the entire board. We also must consider how the exculpatory provision in the McAfee charter affects our review.

### a. *Duty of Loyalty*

The duty of loyalty under Delaware law "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." (*Cede*, *supra*, 634 A.2d at p. 361.) A director is considered independent "only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations." (*Id*. at p. 362.)

The Delaware Supreme Court in *Cede*, *supra*, 634 A.2d at page 362 examined "the quantum of evidence required to rebut the business judgment rule's presumption of director loyalty." The court clarified that self-interest on the part of a single director does not necessarily bar application of the business judgment rule to board action. (*Id*. at

p. 363.)  Rather, "there must be evidence of disloyalty," which may be found in such misconduct as "the motives of entrenchment," "fraud upon the corporation or the board," "abdication of directorial duty," "or the sale of one's vote." (*Ibid*.)  There is no "bright-line rule for determining when a director's breach of duty of independence through self-interest translates into evidence sufficient to rebut the business judgment presumption accorded board action." (*Id*. at p. 364.)

### b.  Duty of Care

"A director's duty to exercise an informed business judgment implicates the duty of care.  Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.' " (*McMullin v. Beran* (Del. 2000) 765 A.2d 910, 921, fn. omitted.)  It requires the directors to " 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,' and 'consider all material information reasonably available' in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent." (*In re Walt Disney Co. Derivative Litigation* (Del. Ch. 2005) 907 A.2d 693, 749, fn. omitted, aff'd by *In re Walt Disney Co. Derivative Litigation* (Del. Ch. 2006) 906 A.2d 27 (*Walt Disney*).)  In the context of a merger or sale, the duty of care "requires a director, before voting on a proposed plan of merger or sale, to inform himself and his fellow directors of all material information that is reasonably available to them." (*Cede*, *supra*, 634 A.2d at p. 368.)  "[A] trial court will not find a board to have breached its duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger or sale of the company.  [Citations.]  Only on such a judicial finding will a board lose the protection of the business judgment rule under the duty of care element and will a trial court be required to scrutinize the challenged transaction under an entire fairness standard of review." (*Ibid*.)

*c. Exculpatory Provision under Section 102(b)(7)*

We address as a preliminary matter the effect of the exculpatory provision in McAfee's charter, adopted pursuant to section 102, subdivision (b)(7) of the Delaware General Corporations Law (hereafter "section 102(b)(7)"). The purpose of section 102(b)(7) is to permit shareholders, through the certificate of incorporation, "to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations and certain other conduct." (*Emerald Partners*, *supra*, 787 A.2d at p. 90; see also *Lyondell*, *supra*, 970 A.2d at pp. 239-240; *McMullin v. Beran*, *supra*, 765 A.2d at p. 926.)

There is no dispute that McAfee's charter during the relevant time period contained a section 102(b)(7) exculpatory provision. The trial court found that McAfee's independent directors could not be held personally liable for breaches of the fiduciary duty of care, and accordingly analyzed the evidence as it pertained to the directors' alleged breaches of the duties of loyalty and good faith.

Plaintiff urges on appeal that any consideration of the exculpatory provision and its impact on defendants' potential liability is not proper at summary judgment and must be made after trial on the merits. (See, e.g., *In re Emerging Communs., Inc. S'holders Litig.*, 2004 Del. Ch. LEXIS 70, at *116, *139 (*Emerging Communications*)[9] [addressing application of § 102(b)(7) exculpatory provision only after trial finding that "freeze-out merger of the minority" by majority stockholders failed entire fairness review].)

_____

[9] Certain Delaware authority relied on by the parties is unpublished. We note that although an unpublished California case opinion may not be cited or relied upon (Cal. Rules of Court, rule 8.1115), citing unpublished opinions from other jurisdictions for their persuasive value does not violate this rule. (See *In re Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 ["Citing unpublished federal opinions does not violate our rules"]; *Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1077 [explaining that opinions from other jurisdictions—some which have different publication criteria than California—can be cited without regard to their publication status and may be regarded as persuasive].)

Defendants respond that Delaware courts routinely apply section 102(b)(7) to enter judgment for director defendants before trial. (See, e.g., *Lyondell*, *supra*, 970 A.2d at pp. 237-239 [reversing denial of defendants' motion for summary judgment, because § 102(b)(7) exculpatory provision protected directors from personal liability for breaches of duty of care, and record revealed no triable issues as to alleged breaches of duty of loyalty in conducting sale of company].)

For present purposes, plaintiff is incorrect. "Depending on the facts of the case, the standard of review, and the procedural stage of the litigation, a court may be able to determine that a plaintiff's claims only involve breaches of the duty of care such that the court can apply an exculpatory provision to enter judgment in favor of the defendant directors before making a post-trial finding of a breach of fiduciary duty and determining the nature of the breach. If a court cannot make the requisite determination as a matter of law on a pre-trial record, then it becomes necessary to hold a trial and evaluate each director's potential liability individually." (*Chen*, *supra*, 87 A.3d at pp. 676-677.)

Plaintiff's reliance on *Emerging Communications* is misplaced, because the transaction in that case (a " 'going private' acquisition of a corporation's minority stock by its majority stockholder") dictated the standard of review for entire fairness. (*Emerging Communications*, *supra*, 2004 LEXIS 70 at *35-36.) As the Delaware Supreme Court explained in *Emerald Partners*, transactions that "require judicial review pursuant to the entire fairness standard *ab initio* do so because, by definition, the inherently interested nature of those transactions are inextricably intertwined with issues of loyalty." (*Emerald Partners*, *supra*, 787 A.2d at p. 93.) In those cases, the exculpatory effect of a section 102(b)(7) provision may only be decided after the directors' potential personal liability has been established based on a finding the transaction was not entirely fair. (*Emerald Partners*, *supra*, at p. 93.) But in cases that "begin with the presumption of the business judgment rule, *ab initio*, . . . proper invocation of a Section 102(b)(7) provision can obviate a trial pursuant to the entire

24

fairness standard, even if the presumption of the business judgment rule is successfully rebutted by a duty of care violation, since liability for duty of loyalty violations or violations of good faith are not at issue." (*Id*. at p. 92.)

The transaction before us is not presumptively subject to entire fairness review. Since we proceed from the starting point of the business judgment rule (or enhanced scrutiny in connection with actions taken when merger negotiations began, see *Lyondell*, *supra*, 970 A.2d at p. 242), invocation of McAfee's section 102(b)(7) charter provision "can obviate a trial pursuant to the entire fairness standard, even if the presumption of the business judgment rule is successfully rebutted by a duty of care violation . . . ." (*Emerald Partners*, *supra*, 787 A.2d at p. 92.) Inasmuch as a breach of the independent directors' duty of care cannot serve as a basis for their personal liability in this case, it cannot serve as a basis for rebutting the presumptions of the business judgment rule.

We conclude that plaintiff's quest to establish entire fairness as the applicable standard of review and to defeat summary judgment as to the independent directors requires a showing of one or more triable issues of material fact pertaining to the non-exculpated loyalty or good faith claims against those directors. A failure to present evidence of a triable issue of material fact as to the non-exculpated breach of the fiduciary duty claims properly results in the affirmance of judgment in their favor. (See, e.g., *Lyondell*, *supra*, 970 A.2d at pp. 237-239; *In re S. Peru Copper Corp. S'holder Derivative Litig*. (Del. Ch. 2011) 52 A.3d 761, 785 [dismissing certain director defendants at summary judgment "because the plaintiff had failed to present evidence supporting a non-exculpated breach of their fiduciary duty of loyalty . . . ."].)

### d. *The Record Does Not Support Review for Entire Fairness*

Plaintiff argues that DeWalt's interest in the merger and alleged manipulation of the independent directors necessitates the application of entire fairness review. Plaintiff focuses on DeWalt's alleged concealment of James's $50-per-share overture and of the pre-due diligence, project Inca exchanges between McAfee and Intel leading up to the

25

June 11 proposal.  Plaintiff contends that the independent directors failed to take steps to protect against conflicts in the process, especially pertaining to DeWalt after the June 11 proposal stated Intel's intent to retain McAfee's management team.  Plaintiff relies primarily on three cases to support this argument:  *Mills*, *supra*, 559 A.2d 1261; *Bomarko*, *Inc*. *v*. *Intern*. *Telecharge*, *Inc*. (Del. Ch. 1999) 794 A.2d 1161 (*Bomarko*); and *Weinberger v*. *UOP*, *Inc*. (Del. 1983) 457 A.2d 701 (*Weinberger*).

*Mills* involved an ongoing "battle for control" of Macmillan, Inc.  (*Mills*, *supra*, 559 A.2d at p. 1265.)  Faced with an unsolicited takeover bid of the company, Macmillan's chairman and CEO (Evans) and president and COO (Reilly), pursued a management-sponsored buyout of Macmillan by an investment firm specializing in leveraged buyouts (KKR).  (*Id*. at p. 1264.)  Macmillan's board of directors granted an asset option agreement (known as a " 'lockup' ") to KKR after it prevailed "as the purported high bidder" in a stilted " 'auction' for control of Macmillan."  (*Ibid*.)  The record teemed with examples of fiduciary misconduct.  For example, Evans and his team agreed to endorse the leveraged buyout to Macmillan's board of directors before KKR had even disclosed the amount of its bid.  (*Id*. at p. 1273.)  During the auction, Evans and Reilly called a KKR representative and " 'tipped' " the competing bidder's offer to KKR (*id*. at p. 1275), then concealed that information from Macmillan's board of directors.  (*Id*. at pp. 1279-1280.)  Throughout the auction process, "KKR was consistently and deliberately favored" (*id*. at p. 1278) while the competing bidder was "deliberately misled" (*id*. at p. 1281) and met "continuing hostility . . . ."  (*Id*. at p. 1282.)

On appeal, the Delaware Supreme Court emphasized that "judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries."  (*Mills*, *supra*, 559 A.2d at p. 1279.)  The court found that "Evans and Reilly, as participants in the leveraged buyout, had significant self-interest in ensuring the success of a KKR bid" and "their deliberate concealment of material information from the Macmillan board must

26

necessarily have been motivated by an interest adverse to Macmillan's shareholders." (*Ibid.*) The court described the management's actions as "resolutely intended to deliver the company . . . to their favored bidder, KKR, and thus themselves" (*id.* at pp. 1279-1280) and found the board "torpid, if not supine, in its efforts to establish a truly independent auction . . . ." (*Id.* at p. 1280.) For example, Macmillan's "directors wholly delegated the creation and administration of the auction to an array of Evans' hand-picked investment advisors." (*Id.* at p. 1281.) The court concluded that "divided loyalties . . . on the part of certain directors, and the absence of any serious oversight by the allegedly independent directors" mandated review under the entire fairness standard. (*Id.* at p. 1265.)

Bomarko involved the merger of International Telecharge, Inc. (ITI), into a corporation that was wholly-owned by ITI's chairman and CEO, Ronald Haan. (*Bomarko*, *supra*, 794 A.2d at pp. 1164-1165.) ITI was facing default on its long-term debt. Haan, who also was a significant creditor and large stockholder of ITI, approached Bell Atlantic about a possible loan. Bell Atlantic initially proposed a loan that did not meet ITI's needs, but later sent Haan a term sheet that more closely reflected ITI's request. (*Id.* at pp. 1168-1169.) Haan did not disclose the term sheet to ITI's board of directors or disabuse their understanding that Bell Atlantic likely could not meet ITI's needs. (*Id.* at p. 1169.) Instead, Haan proposed that he might be able to provide financing or purchase ITI's assets. (*Ibid.*) Haan then contacted Bell Atlantic without informing the board's special committee and counter-proposed terms that were "materially inconsistent with ITI's needs." (*Id.* at p. 1170.) The board eventually approved a merger between ITI and Haan's corporation, in part based on the belief that ITI was unable to obtain financing or otherwise avoid bankruptcy. (*Id.* at p. 1175.)

The Court of Chancery observed that Haan's illicit counter-proposal "interfered with whatever opportunity ITI had to obtain financing from Bell Atlantic." (*Bomarko*, *supra*, 794 A.2d at p. 1170.) The court found it to be evidence of bad faith, because Haan

27

"intended to divert" the financing opportunity "away from ITI at the moment ITI most needed it" while "affirmatively tr[ying] to conceal" his conduct from the board special committee, and later from the plaintiffs in the shareholder action. (*Id*. at p. 1173.) The court compared Haan's conduct to the CEO's " 'illicit manipulation' " of the board's process in *Mills* (*id*. at p. 1178) and concluded that the "acts of disloyalty" by Haan "interfered with the other directors' efforts to benefit ITI's shareholders" and required the court to review the transaction under the "entire fairness" standard. (*Id*. at p. 1179.)

In *Weinberger*, acquirer (Signal) owned a majority interest of stock in target (UOP), and several Signal directors and employees served on UOP's board of directors. (*Weinberger*, *supra*, 457 A.2d at pp. 703-704.) Two members of Signal's senior management, who were also UOP directors, prepared a feasibility study about acquiring the balance of UOP's outstanding shares. The study concluded that it "would be a good investment for Signal . . . at any price up to $24 [per share]." (*Id*. at p. 705.) After UOP's president and CEO (who also was a Signal director) responded favorably to Signal's intent to acquire full ownership of UOP at a proposed price range of $20 to $21, Signal authorized a cash-out merger at $21 per share. (*Ibid*.) The feasibility study was not shown to the independent UOP directors or disclosed to UOP's minority shareholders before their approval of the merger. (*Id*. at p. 707.)

The Delaware Supreme Court emphasized that the feasibility study was of material significance to UOP and its shareholders. (*Weinberger*, *supra*, 457 A.2d at p. 709.) "Since the study was prepared by two UOP directors, using UOP information for the exclusive benefit of Signal, and nothing whatever was done to disclose it to the outside UOP directors or the minority shareholders, a question of breach of fiduciary duty arises. This problem occurs because there were common Signal-UOP directors participating, at least to some extent, in the UOP board's decision-making processes without full disclosure of the conflicts they faced." (*Ibid*.) The court further explained that when directors are on both sides of the transaction, "[g]iven the absence of any

attempt to structure this transaction on an arm's length basis," the directors had to meet the burden of establishing entire fairness. (*Id.* at p. 710.)

Plaintiff likens DeWalt's conduct to that of the CEOs in *Mills* and *Bomarko* and the conflicted directors in *Weinberger*. Plaintiff points out that DeWalt never disclosed James's inquiry about $50-per-share to the McAfee board or its financial advisors, depriving them of material information against which to gauge the $48-per-share offer that came after. Plaintiff also asserts that DeWalt concealed project Inca and the pre-June 2010 merger discussions with Intel from the McAfee board members, produced key documents associated with project Inca only at the very end of discovery in this case, and was evasive and "affirmatively lied" in his deposition regarding McAfee's pre-June 2010 dealings with Intel and the timing of discussions with Intel about keeping McAfee's management team in a transition.

Defendants contest the relevance of *Mills*, *Bomarko*, and *Weinberger* to this case. We agree that the record as it relates to DeWalt's self-interest, alleged acts of deceit and concealment, and the efficacy of the board as a neutral decisionmaking body, contains no semblance of the conflicting interests or obstructive, manipulative conduct that permeated those cases and mandated review for entire fairness.

First, regarding DeWalt's self-interest, plaintiff presents DeWalt's actions as motivated by a lucrative career built on "pushing the companies he leads into change-of-control transactions" at "extraordinary financial benefits" to himself. Plaintiff asserts that DeWalt's expectation of post-merger employment predated the June 11 proposal by a few months based on indications that Intel would want a McAfee acquisition to be consistent with its recent acquisition of another company called Wind River. In support, plaintiff points to deposition testimony in which DeWalt stated that during discussions Intel "would point to the ways in which they had acquired a previous firm called Wind River and what they had done with that structure." Plaintiff argues that like Haan in *Bomarko*, *supra*, 794 A.2d at pages 1173 through 1174, who the court found

29

had "attempted to conceal" (*id.* at p. 1174) his wrongful actions, DeWalt "affirmatively lied" in deposition regarding his future employment interest. Although DeWalt responded "No" after being asked whether his June 10 meeting with James included any discussion of keeping McAfee's management on board through an acquisition, he also testified (only a few minutes earlier, based on the transcript) that in "the June 10th conversation, the notion of a wholly owned subsidiary, full-functioning business unit concept was first relayed to me, and . . . I would say the notion of the management team and the employees being considered as part of the value was—was spoken." Reasonably construed in plaintiff's favor, this discrepancy hardly amounts to an affirmative lie. DeWalt further testified that remarks about Wind River were "not necessarily in context with McAfee" and that his June 10 meeting with James was the first time that he received concrete indication of the proposed merger structure.

Plaintiff also points to notes produced in connection with the deposition of James's colleague at Intel, Donald Harbert, as support for plaintiff's argument that DeWalt angled early for his employment terms with Intel. The notes appear to indicate that James described her June 10 meeting with DeWalt to Harbert, who wrote that McAfee's top management would need a retention plan and that DeWalt would only want to stay two years.[10] Plaintiff points to DeWalt's employment agreement with Intel, with its promised special retention bonuses, acceleration of stock options, and other valuable equity awards; but it is undisputed that these terms were negotiated well after the companies' joint merger announcement. And plaintiff does not dispute that DeWalt stood to earn over $1.3 million for each additional dollar per share that Intel paid for McAfee, providing an obvious incentive to negotiate a higher sale price if possible.

---

[10] Harbert was not present for the June 10 meeting between James and DeWalt. Harbert testified that his personal notes were intended for what he might need to remember from a discussion, not to make a record.

We find that plaintiff has not raised a triable issue of material fact as to DeWalt's postmerger employment. It is undisputed that the June 11 proposal received by DeWalt and the McAfee board indicated Intel's intent to retain McAfee management. DeWalt and James separately testified that employee retention agreements were discussed later in the process, after McAfee's board had approved the $48-per-share price, and the terms of DeWalt's employment with Intel, including his compensation package and bonus, were discussed even later. Plaintiff does not argue that any aspect of those negotiations were improper. At most, the evidence viewed in the light most favorable to plaintiff supports an inference that DeWalt had reason to believe, leading up the June 11 proposal, that he would be asked to stay on as McAfee's head in the event of an acquisition by Intel and that he indicated the extent of interest in such an arrangement (i.e., not more than two years) during their June 10 meeting. This is insufficient for a showing that DeWalt's interest in the transaction diverged from that of McAfee's shareholders. (See *Cede*, *supra*, 634 A.2d at p. 361 [best interest of the corporation and shareholders must take precedence over any interest possessed by a director or officer "and not shared by the stockholders generally"].)

In fact, the Delaware Supreme Court spoke to the issue of actual or assumed director interest in *Cinerama*: " 'The fact that some interested transactions are permitted under our corporate law demonstrates that they are not inherently detrimental to a corporation. As long as a given transaction is fair to the corporation, and no confidential relationship betrayed, it may not matter that certain corporate officers will profit as the result of it. . . . The key to upholding an interested transaction is the approval of some neutral decision-making body.' " (*Cinerama*, *supra*, 663 A.2d at p. 1170.) The high court thus approved the Court of Chancery's reasoning that " 'the interest of [the directors] was disclosed and a majority of the non-interested directors approved the transaction in good faith,' " and that " 'the alleged hope of better employment opportunities' " or "assumed interest" of another director was insufficient. (*Ibid*.)

31

Here, the June 11 proposal dispels any inference that DeWalt concealed his future employment prospects from the independent directors. Plaintiff's reference to *Krasner v. Moffett* (Del. 2003) 826 A.2d 277, 283, footnote 18 (finding that an "expected . . . benefit" to directors' business and consulting relationships was sufficient to state a claim that the directors suffered a disabling conflict of interest) is unhelpful insofar as it addresses the sufficiency of breach of fiduciary duty claims at the pleading stage only. *Mills* and *Bomarko* provide apt illustrations of interested corporate fiduciaries. The target company's chairman and CEO in *Mills* orchestrated a management-sponsored buyout of the company in which the management would receive up to 20 percent ownership in the newly formed company. (*Mills*, *supra*, 559 A.2d at pp. 1264, 1265.) In *Bomarko*, the company chairman and CEO steered the company into a merger with his own, wholly-owned corporation after interfering with the company's efforts to find alternative financing and avoid bankruptcy. (*Bomarko*, *supra*, 794 A.2d at p. 1181.) The record before us bears no resemblance.

More comparable are the facts in *In re Toys "R" Us, Inc.* (Del. Ch. 2005) 877 A.2d 975, 1003, in which the plaintiffs challenged the motives of the CEO of the target company in a bid for sale due to his expected gain of "over $60 million from the sale" (*ibid.*) and his knowledge that the bidder's initial bid was conditioned on the retention of key but unidentified members of management. The court rejected this argument, explaining that the condition for retention of management was removed in later bids, and the CEO's equity in the company created "more incentive than almost anyone to make sure that the board did the best risk-adjusted job it could of getting the best price." (*Id.* at p. 1004.) Similarly here, DeWalt and the independent directors were aware of Intel's intent to retain key management at the time that negotiations began following the June 11 proposal, but no meaningful action or discussions related to retention occurred until after McAfee's board had accepted the offer at $48 per share.

32

Next, plaintiff asserts that DeWalt hampered the board's deliberative process by concealing project Inca and James's overture asking whether $50 per share would "get the deal done."

The record establishes that DeWalt contemplated the possibility of an acquisition by Intel as early as his first meeting with James and Intel representatives in March 2010, and brainstorming about potential synergies of an acquisition began in earnest after the meeting at Intel's headquarters on April 4, 2010. According to a "McAfee/Intel Partnership Chronology" that McAfee's Gerhard Watzinger sent to DeWalt shortly after McAfee received the June 11 proposal, April 2010 was the "first brainstorming meeting with Intel about potential synergies of an acquisition," and in May 2010 there were "various meetings and calls with Intel regarding pre-due diligence data collection." The record reflects detailed exchanges between McAfee and Intel management during this period. In an e-mail on May 28, Watzinger told DeWalt that "Inca" was sending "[l]ot's [*sic*] of requests for data; i.e. gross margins of businesses, renewal vs. x-sell vs. new customers, attrition, etc." The record shows that DeWalt did not update the board specifically about project Inca or these detailed exchanges during the period leading up to the June 11 proposal.

On the other hand, the evidence shows that the independent directors expected DeWalt to engage in discussions with potential partners and acquirers and viewed the related exchanges of information to be appropriate. Chairman Robel testified that in the spring of 2010, DeWalt told him that Intel had "expressed a greater interest in McAfee" and was "looking at additional information," and that DeWalt had meetings with James over "some period of weeks." According to Robel, "it wouldn't have been unusual" in that context for DeWalt to have "provided all sorts of analysis around our business, their business, and the opportunities between the two." When Robel learned that Intel "was asking more questions about the business," he believed it might have been a "fishing

expedition" because a combination with Intel was "pretty out of the box and is subsequently viewed by people as being pretty out of the box."

The expressions of surprise at Intel's June 11 proposal appear to be closely tied to this generally-held view that Intel was an unlikely acquirer. For example, defendant Pangia testified that DeWalt "kept the board abreast of discussions that . . . evolved initially from what we thought would be a joint venture to the potential to do something greater." According to Pangia, "part of Dave's job was to determine whether or not there was an acquirer out there . . . . So Intel was part of those discussions. [¶] . . . I can recall he said, you know, this is sort of curious. It's not an obvious fit, but it could have the potential to turn into something. [¶] So the board had been aware that [Intel] was a possibility for some period of time in my recollection."[11]

Even DeWalt, according to James's testimony about their June 10th meeting, "seemed surprised that we actually gave him an offer . . . ." These statements support the inference that the independent directors had only a high-level understanding of the exploratory merger discussions between McAfee and Intel management; they do not support an inference that the independent directors were uninformed or kept in the dark about those discussions.

Upon receiving the June 11 proposal, the McAfee board retained Morgan Stanley to serve as McAfee's financial advisor. Plaintiff contends that neither DeWalt nor Morgan Stanley provided the board with the appropriate discussion materials or

_____

[11] Several other defendants explained their surprise at the June 11 proposal. Defendant Bass testified that he was "surprised" by the $45-per-share proposal because he "thought it was a rich offer" and did not think of Intel as a likely buyer. Defendant O'Leary testified that there were "continual briefings from our CEO about discussions with Intel" in which "James was involved and some other Intel execs," though O'Leary had understood the discussions to be focused on the joint venture. Defendant Darcy did not recall discussions about an acquisition by Intel before the June 11 proposal and was surprised because he "didn't quite view Intel as a potential acquirer of McAfee . . . ."

quantitative analysis about the synergies and "billion-dollar" opportunities identified in the project Inca collaboration. Contrary to this claim, the record reflects discussion of these topics between McAfee management, Morgan Stanley, and the McAfee board, though not in direct reference to "billion dollar" or "$1B+" ideas. Each of the eight "billion dollar" opportunities was outlined in the "Key Synergies" section of McAfee's presentation to Intel during due diligence meetings beginning on June 15.[12] The minutes of the McAfee board's June 17 special meeting that followed the two-day due diligence session describe DeWalt's update for the board on McAfee's due diligence efforts to support a higher valuation from Intel and Morgan Stanley's summary of the negotiations and its assessment of Intel's offer. DeWalt also discussed a call that he had that same day with a senior Intel executive, who he informed that "based on the additional synergies that [McAfee] had presented to [Intel] during the due diligence meetings, [McAfee] believed a higher offer was warranted."

In addition, Morgan Stanley's lead advisor to McAfee testified that he discussed "the synergy potential for a transaction" with McAfee's management but did not include "revenue synergies" in the analysis to the McAfee board because they were "focused on the stand-alone value of the business" and synergies "are not something that McAfee can achieve on a stand-alone basis." When director defendant Carl Bass was questioned about each of the "billion-dollar" opportunities, he responded as to each that he was familiar and was not sure if McAfee had prepared financial models, but "would hope"

---

[12] Side-by-side comparison of McAfee's "key synergies" slides and the document circulated between Intel and McAfee management in April 2010 shows all eight categories of "$1B+" opportunities reflected in the due diligence presentation, including "Embedded device protection," "Security for mobile/handheld devices," "Patmos," and others. Although plaintiff contends that McAfee's slides contained no quantification of value or revenue potential, neither does the document that was circulated in April 2010, which contains columns for "Technology," "McAfee Value-Add," "Description," and "Opportunity Mapping" (connecting each technology to one of the eight "$1B+" categories) but does not quantify values or reference financial data or projections.

that Morgan Stanley and McAfee management had not placed a value on the potential revenues from the opportunities because "it's a speculative market" and at the time the merger was under consideration "wasn't at the point of being substantial enough to value in that way."

Plaintiff points to Intel's substantially higher internal valuation of McAfee at between $56 and $90 per share when including "financial and strategic" synergies[13] as evidence that Intel unfairly captured the value of the ideas discussed in project Inca. Once again, we do not find that the evidence above supports this inference because Intel's valuation of synergies from a merger was strictly internal and was based on the concept that strategic synergies were speculative and were not to be "give[n] away . . . in a deal." Intel's financial advisor in the transaction, Jon Woodruff of Goldman Sachs, explained that materials prepared for Intel's board of directors separated the estimated synergy value because "synergy achievement is speculative by nature . . . ." Intel board member and former chairman, Dr. Jane Shaw, testified that the strategic synergies estimate "would be heavily discounted by the board" because it is "a fact" that they are speculative. James testified that "strategic synergies aren't part of the deal . . . the financial synergies are the only considerations for the deal." In response to a question about Intel's $56 per share valuation, James explained, "there's no 56. [¶] Synergies are for the acquirer. . . . [I]n fact, in our offer at 45, we were already giving them some of the synergies."

In sum, the evidence and inferences reasonably drawn therefrom show that DeWalt provided the McAfee board with broad-brush updates about the discussions with

---

[13] James explained in her deposition Intel's use of the terms "financial" and "strategic" synergies. Financial synergies were those that Intel "could directly calculate," such as "ability to address markets that Intel was in that McAfee was not, and their ability to expand their distribution as part of Intel." Strategic synergies were "more hopeful than direct calculation" and represented markets that Intel was looking to enter.

36

Intel as they unfolded (prior to the June 11 proposal), which was consistent with the board's expectations at the time. The evidence further shows that the financial materials that Morgan Stanley prepared for the McAfee board once active negotiations had begun did not provide a value for strategic synergies but instead focused on McAfee's standalone value and prospects. This evidence does not add up to present triable issues concerning DeWalt's alleged concealment of project Inca and failure to adequately inform the board about management's synergy discussions with Intel prior to June 2010. Unlike the conflicted directors in *Weinberger* who failed to share the feasibility study with their fellow directors and applied it "for the exclusive use and benefit" of the acquirer (*Weinberger*, *supra*, 457 A.2d at p. 708), we find no support for the inference that DeWalt was aware of information that would have justified a higher-value offer from Intel, yet inexplicably concealed that information from the board.

DeWalt's failure to disclose James's $50 overture presents a closer question; but the same reasoning prevails insofar as it impacts the standard of review. The record shows that McAfee's presentations to Intel during the early June due diligence negotiations led James to surmise that Morgan Stanley had "convinced" McAfee that they were "worth 55"—a value that James testified her team had "backed into" and believed to be "very lofty . . . ." Negotiations during the final week of June 2010 left James "modestly confident" that if Intel was prepared to offer $50 per share, they would "get a handshake."[14] James discussed Intel's strategy internally via e-mail with Andy Bryant, who suggested that James ask DeWalt "if he can deliver 50," and added "[f]or 50, we have to deliver some better news from our research the last few weeks."

---

[14] In an e-mail to Andy Bryant of Intel dated June 30, 2010, James described the discussions that week with DeWalt, Morgan Stanley, and Wilson Sonsini: "they get that we weren't going to get to or near 50 last week—Dave has not been willing to affirm other than he would work to get his board to say 'they would do 50' . . . and we know some of the board is at 52-55 . . . ."

James testified that she spoke with DeWalt over the weekend of July 4th and asked "will 50 get the deal done" if she were to get authorization for that amount from Intel's board, noting "[i]t's outside our engagement range." According to James, DeWalt responded "no, 52 to 54." James testified that she did not speak with DeWalt for "a couple weeks after," having decided to wait until the second quarter results. James explained that McAfee was "in a falling market, their stock was going down, and we knew their quarter wasn't good. So we said: You know what? We see real weaknesses in their business. And we were concerned that we needed to wait and get more data."

Several McAfee board members testified that they did not recall hearing about any such communication from Intel. Defendant O'Leary stated that he would have wanted to know if that type of conversation had occurred. And as plaintiff emphasizes, the proxy materials did not inform McAfee's shareholders that before making the cash offer of $48-per-share, James had asked DeWalt if a $50-per-share offer would close a deal, if she could get authorization.

Plaintiff argues that like Haan in *Bomarko,* DeWalt's actions "make it impossible to know what *would have* happened if he had acted in accordance with his fiduciary duties" (*Bomarko*, *supra*, 794 A.2d at p. 1177) and made full and timely disclosures to the board and its advisors. Plaintiff asserts that at a minimum, on summary judgment it is entitled to the inference that McAfee's board "would not have accepted $48 per share had it been told that $50 was offered just days earlier." Plaintiff further asserts that had the board known about DeWalt's rejection of "an informal $50 offer," it would not have "panicked" when Intel paused negotiations, causing it to "abandon the $50+ per share price range it had previously determined to be fair and settle for a price . . . in the 'non-starter' range." While plaintiff is entitled to all favorable inferences that can be reasonably drawn from the evidence, a scenario in which the board would not have accepted the offer at $48 per share based on James's overture to DeWalt is highly

38

speculative and generally contradicted by the evidence of what followed James's conversation with DeWalt.

While James testified that she recalled not speaking with DeWalt for "a couple weeks after," having decided to wait until the second quarter results, the e-mail communication immediately following the 4th of July weekend showed that James continued to seek information from DeWalt that could help her justify a higher offer.[15] DeWalt's response stressed an optimistic and confident outlook for the company. He emphasized that McAfee "ended Q2 with very strong results" and highlighted certain deals and bookings for the quarter, adding: "Renee, I'm hoping this is exactly the type of 'good new news' that might help move things forward on your end. We really feel very good about our business, and we're trading at SUCH a low valuation multiple, I hope you can see how we view things from a fundamental perspective. We have good momentum, . . . so I just don't see a lot of risk in front of us." In a follow-up e-mail between DeWalt, McAfee's financial advisors, and chairman Robel, DeWalt explained that Intel had "floated [the] idea of increasing offer 'slightly, to keep ball rolling' " and he had "encouraged them to show us a price that was in our 'expectation range.' " DeWalt also stated that Intel "will most likely wait for next step until after Q2 earnings," to which Mike Wyatt of Morgan Stanley responded that he understood from Intel's financial advisors at Goldman Sachs that Intel was "(still) ready to rock and roll." Wyatt added, "Proposed action would be to assemble a data pack to help them with follow-up. Not rushed, we can take our time and dress it up. Agree?"

---

[15] James sent an e-mail to DeWalt on the evening of July 5, 2010—apparently just after the conversation she testified took place that weekend which reads: "Hi, Happy 4th of July—just checking in as I know you were busy last week with the quarter close. Hope all turned out well there—any updates you can share? I think we should schedule a call this week and see if we can get going."

39

This record does not support an inference that DeWalt was acting other than in McAfee's interest by seeking to convince Intel that McAfee's second quarter results merited an offer in its "expectation range." Nor is there evidence from which to infer that Intel's board was prepared to authorize a higher offer, or that DeWalt deceived the independent directors after receipt of the $48-per-share offer by advising that Intel "was not willing to further increase its offer to acquire the Company." The internal exchanges between James and Andy Bryant suggest that while James had considered approaching Intel's board for authorization up to $50, Bryant advised her that she needed "better news" from McAfee in order to do so. James responded that she had "confirmation on our synergies and a few pieces of good news including a very big pipeline." Bryant testified that he did not know if Intel's board "would have gone to 50." He explained that the engagement authorization up to $49 was "[s]ubject to due diligence and other, whatever was happening in the marketplace . . . ." James testified that $48 was the highest price that Intel's board ever authorized for an acquisition of McAfee.

The evidence related to the marketplace outlook and second quarter results further does not support an inference that an offer higher than $48 per share would have been forthcoming. Plaintiff points out that despite falling below market expectations, McAfee's revenue results still represented the "17th consecutive quarter of double-digit, year-over-year revenue growth." This fact must be viewed in the context in which merger negotiations were taking place. James testified that McAfee's "stock was going down" and that around the time of Intel's June 11 proposal, "[t]he business went off a cliff," dropping another $3 by the time McAfee's board had accepted the second offer. According to James, McAfee had missed its second quarter and showed "very weak forward guidance." James communicated internally to Intel's board committee that she had waited for written confirmation of McAfee's second quarter results, which "were in line with what we expected," before making the revised offer. DeWalt described the results as "mixed" with McAfee having "missed pretty substantially" analyst expectations

40

in a few key categories but having beat expectations in others. Chairman Robel testified that "it was not a good quarter" and "there was a lot more cloud around the company's ability to grow in the future." And Dr. Shaw testified that Intel's board at that time was watching McAfee's market performance "very closely . . . and it actually wasn't doing well."

Plaintiff argues that the revised offer letter does not indicate that it was Intel's best and final offer, and that James communicated internally that the strategy if McAfee were to ask for more was "to wait them out until sometime after their earnings announcement." This is insufficient to support an inference that Intel might have gone higher, or that DeWalt misled the board by "stoking its fears" about the company's prospects, because evidence throughout the record indicates that Intel did not intend to go higher and communicated this fact to McAfee through several channels. In James's e-mail to Intel's board committee, she confirmed that Goldman Sachs "delivered 'hard message' to Morgan [Stanley] alongside $48." James testified that she considered the offer at $48 to be final and "[n]o way" was prepared to ask for more. Jon Woodruff of Goldman Sachs testified that "when we made our move to 48, we absolutely advised [Intel] to take a very hard line, make it very clear that we didn't have a penny more and that we were walking and moving [in] another direction." Woodruff explained that he delivered the same message to his counterpart at Morgan Stanley and that "we were actually planning on stepping away from the transaction, at least for some period of time, if we didn't get it done at 48." Dr. Shaw testified that $50 was "beyond the range that the board here approved" and that Intel's subcommittee on the McAfee acquisition had decided in its last meeting "that if we communicated the 48 price, it would be made clear that that was our last and final offer."

Thus, plaintiff relies on inferences that are not supported by the record. Setting aside whether DeWalt's failure to share the details of his conversation with James raises any triable issues related to his individual fiduciary duties, we find that the evidence falls

41

short of that required to rebut the presumptions of the business judgment rule for actions taken by the board. Specifically, the assertion that DeWalt's conduct misled the board into accepting the $48 offer—which may not have been best and final—is rife with speculation and contradicted by the evidence showing that $48 was in fact best and final. In comparison with the ongoing "domination of the allegedly 'independent' board by the financially interested members of management" in *Mills*, *supra*, 559 A.2d at page 1266, there is no evidence that DeWalt exercised improper influence over the other board members or its deliberations over the $48-per-share offer. We conclude that the fact that the board was not aware of James's $50 overture did not compromise its ability to effectuate its role as "a 'neutral decision-making body.' " (*Cinerama*, *supra*, 663 A.2d at p. 1170, fn. 25.)

## 2. *The Enhanced Scrutiny Analysis*

Having concluded that plaintiff did not meet its burden to establish entire fairness review, we turn to consider whether the trial court erred in finding no triable issues of material fact as to either the independent directors or DeWalt. As noted above, the duty of the board of directors in a change of control scenario is "to seek the best available price." (*Lyondell*, *supra*, 970 A.2d at p. 242; *Revlon*, *supra*, 506 A.2d at p. 182.) The directors' obligation is "to secure the transaction offering the best value reasonably available for the stockholders" and to "exercise their fiduciary duties to further that end." (*Paramount*, *supra*, 637 A.2d at p. 44.) As the Delaware Supreme Court explained in *Paramount*, *supra*, at page 45, "a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination."

42

### a. Independent Directors

In opposing the motion for summary judgment, plaintiff did not dispute that the independent directors—who comprised nine of the 10 members of McAfee's board—were experienced, outside directors, none of whom joined Intel after the merger. Indeed, plaintiff on appeal does not appear to contest the independent directors' independence, meaning that each director's decision was "based entirely on the corporate merits of the transaction and [was] not influenced by personal or extraneous considerations." (*Cede*, *supra*, 634 A.2d at p. 362.) Nor does plaintiff appear to contest the reasonableness of the independent directors' actions or efforts to secure the best available price based on their knowledge of the circumstances at the time. (*Paramount*, *supra*, 637 A.2d at pp. 44-45.)

Rather, plaintiff contends that triable issues of fact exist with respect to the independent directors' alleged failure to oversee conflicted fiduciaries—namely, DeWalt. This argument requires little additional consideration, given our conclusion above that plaintiff failed to establish a triable issue of fact concerning DeWalt's fiduciary duty of loyalty based on post-merger employment and financial interest in the merger. (See *ante*, section II.C.1.d.) Plaintiff cites no authority under Delaware law to support its argument that DeWalt's interest in the transaction—which was established by the June 11 proposal—required the board to take direct control of the negotiations with Intel or to form an independent committee. Delaware courts have rejected similar arguments in cases where the evidence showed the board met its overall supervisory obligations. (See, e.g., *In re MONY Group Inc. Shareholder Lit.* (Del. Ch. 2004) 852 A.2d 9, 20 [board could appropriately rely on CEO who allegedly " 'stood to gain excessive payments' " under change in control agreements, where board "actively supervised [the CEO's] negotiations" and "demonstrated its independence and control" by rejecting and modifying aspects of the proposed deal].)

Plaintiff compares the alleged failure of the McAfee board to protect against DeWalt's conflicts to the board's oversight failures in *Mills*. The comparison is not

accurate.  In *Mills*, the board "wholly delegated the creation and administration of the auction to an array of [CEO] Evans' hand-picked investment advisors" despite the fact that management insiders were "among the bidders."  (*Mills*, *supra*, 559 A.2d at p. 1281.)  The court described the board as "torpid, if not supine, in its efforts to establish a truly independent auction" for having placed "the entire process in the hands of Evans, through his own chosen financial advisors, with little or no board oversight."  (*Id*. at p. 1280.)

Here, the record is devoid of any similar evidence of board passivity.  Plaintiff does not challenge defendants' showing that upon receiving the June 11 proposal, the board, not DeWalt, retained outside legal counsel and financial advisors and negotiated the terms of Morgan Stanley's engagement with significant incentives for securing a higher offer.  After determining that Intel's initial offer was too low, the board directed DeWalt to communicate to Intel that $45 per share was inadequate.  The board met in formal session nine times over the course of about nine weeks of negotiations for updates on the process and considered reports from the board's advisors as well as DeWalt.  During that time, with input from Morgan Stanley, the board considered other potential acquirers and their likely ability to complete an acquisition and ultimately directed DeWalt to approach the most likely company suitor, which declined, in order to gauge its interest.

On this record, we find no support for the alleged, "virtual abandonment" of the independent directors' oversight functions "in the face of [DeWalt's] patent self-interest." (Cf. *Mills*, *supra*, 559 A.2d at p. 1284, fn. 32.)  To the contrary, "the record establishes that the directors were disinterested and independent; that they were generally aware of the company's value and its prospects; and that they considered the offer, under the time constraints imposed by the buyer, with the assistance of financial and legal advisors." (*Lyondell*, *supra*, 970 A.2d at p. 237.)  In *Lyondell*, the Delaware Supreme Court found similar evidence sufficient to entitle the director defendants to the entry of summary judgment.  (*Ibid*.)  Addressing the trial court's skepticism about whether the board of

44

directors conducted the week of negotiations for the sale of the company in good faith, the high court emphasized that "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." (*Id*. at p. 243.) This stems from Delaware law's treatment of conduct not in good faith, which "encompasses not only an intent to harm but also intentional dereliction of duty . . . ." (*Id*. at p. 240.) Examples include a fiduciary's " 'intentional[] fail[ure] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.' " (*Id*. at p. 243, quoting *Walt Disney*, *supra*, 906 A.2d at p. 67.)

We conclude that like in *Lyondell*, plaintiff has not proffered evidence on which a reasonable trier of fact could conclude that the independent directors intentionally disregarded their duty to oversee the transaction in order to secure the best price reasonably available under the circumstances. (*Lyondell*, *supra*, 970 A.2d at pp. 243-244; *Paramount*, *supra*, 637 A.2d at pp. 44-45.)

Plaintiff also contends that there are triable issues as to whether the independent directors acted in bad faith by consciously disregarding their obligation to disclose all material information in the proxy statement. Plaintiff argues that if the independent directors were informed of discussions between Intel and McAfee leading up to the June 11 proposal, then they were required to disclose those discussions in the proxy statement, and their knowing disregard of that obligation violated their duties of loyalty and good faith.

Under Delaware law, "the obligation to disclose all material facts fairly when seeking shareholder action is merely a specific application of the duties of care and loyalty." (*In re Transkaryotic Therapies*, *Inc*. (Del. Ch. 2008) 954 A.2d 346, 357 (*Transkaryotic*); accord *Malpiede v*. *Townson* (Del. 2001) 780 A.2d 1075, 1086.) As such, recovery for monetary damages based on disclosure claims may be barred by application of a section 102(b)(7) exculpatory provision. (*Arnold v*. *Society for Sav*. *Bancorp*, *Inc*. (Del. 1994) 650 A.2d 1270, 1287 (*Arnold*); *Transkaryotic*, *supra*, at p. 360

["where a breach of the disclosure duty does not implicate bad faith or self-interest, both legal and equitable monetary remedies . . . are barred on account of [section 102(b)(7)]"].)  Furthermore, due to the nature of a disclosure violation—i.e., depriving shareholders of complete and accurate information in casting their votes, a breach of the disclosure duty leads to irreparable harm, limiting a court's ability to remedy the harm once the merger has closed.  (*Transkaryotic*, *supra*, at p. 361.)

We find plaintiff's contention that the failure to disclose the pre-June 2010 discussions and document exchanges between McAfee and Intel was "knowing" or "intentional" to be wholly conclusory.  The Delaware Supreme Court's decision in *Arnold* is instructive.  There, the plaintiff sought to prove that alleged disclosure violations qualified as exceptions to the section 102(b)(7) exculpatory provision by arguing, in relevant part, that the defendants' knowing or deliberate failure to make proper and complete disclosures implicated the duty of loyalty and the proscription against knowing, intentional violations of the law.  (*Arnold*, *supra*, 650 A.2d at pp. 1287-1288.)  The court rejected this argument as unsupported by the record, noting that the individual defendants did not violate the duty of loyalty under the facts of the case and the record did not support an intentional disclosure violation.  (*Id*. at p. 1288.)  The court added, in dictum, that it found "unpersuasive plaintiff's contention . . . that defendants' intentional decision to disseminate the proxy statement leads ineluctably to a finding that they deliberately violated their disclosure obligations."  (*Ibid*., fn. 35.)

So too here, the independent directors did not breach the duty of loyalty under the facts of the case, and plaintiff fails to offer evidence that any disclosure violation was knowing or deliberate.  Plaintiff relies on the independent directors' purported awareness of the evolving discussions between Intel and McAfee prior to June 2010.  We find that under *Arnold*, the fact that defendants were generally informed about the discussions that precipitated the June 11 proposal does not in and of itself create a triable issue of fact as to whether the information was omitted from the proxy materials due to a failure of

46

loyalty or bad faith. Following *Arnold*, "a violation of the duty of disclosure is not necessarily a breach of the duty of loyalty." (*Cinerama*, *supra*, 663 A.2d at p. 1163, fn. 9, citing *Arnold*, *supra*, 650 A.2d at pp. 1287-1288; see also *Zirn v. VLI Corp.* (Del. 1996) 681 A.2d 1050, 1062 ["A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty."].) As for the failure to act in good faith, it "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)." (*Stone v. Ritter* (Del. 2006) 911 A.2d 362, 369 (*Ritter*); see also *Lyondell*, *supra*, 970 A.2d at p. 243.)

Plaintiff cites *Chen*, *supra*, 87 A.3d 648, for the proposition that the knowing failure to disclose material information in a proxy statement can constitute a non-exculpated breach of fiduciary duty. *Chen* is inapposite. The court in that case rejected the defendants' invocation of the section 102(b)(7) exculpatory provision with respect to various disclosure claims, because it could not determine on summary judgment whether the disclosure violations resulted from a breach of the duty of loyalty or the duty of care. (*Chen*, *supra*, at pp. 691-692.) Here, we find that absent some evidence supporting its claim of a non-exculpated fiduciary duty, plaintiff has failed to create a triable issue of material fact regarding the independent directors' alleged disclosure violations.

Accordingly, summary judgment is appropriate because any disclosure violation would implicate only the duty of care and would not lead to the imposition of monetary damages under McAfee's section 102(b)(7) exculpatory provision. (See *Transkaryotic*, *supra*, 954 A.2d at pp. 362-363.) Alternatively, as plaintiff acknowledges, the court "cannot grant monetary or injunctive relief for disclosure violations in connection with a proxy solicitation in favor of a merger . . . after that merger has been consummated . . . where there is no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures." (*Id*. at p. 362.)

47

### b. *DeWalt*

This decision already summarized in detail plaintiff's contentions and the evidence demonstrating DeWalt's allegedly self-interested and deceitful conduct.  (See *ante*, section ii.C.1.d.)  We found that DeWalt's interest in the transaction " 'was disclosed[,] and a majority of the non-interested directors approved the transaction in good faith.' " (*Cinerama*, *supra*, 663 A.2d at p. 1170.)  The specific terms of DeWalt's compensation and employment agreement with Intel were not known until after the board's decision to authorize merger negotiations at the $48-per-share price, and McAfee's experienced compensation committee members reviewed DeWalt's employment agreement with Intel before the board's vote to approve the merger agreement.  Further, it was undisputed that DeWalt stood to earn over $1.3 million for each additional dollar per share that Intel paid for McAfee, though other incentives like retention bonuses and accelerated vesting of stock were not contingent on the price obtained in a sale.

Next we found that DeWalt provided high-level updates, consistent with the board's expectations during the early merger discussions.  After Intel unveiled its initial offer in the June 11 proposal, the board retained experienced transactional and financial advisors and consulted with those advisors throughout the process.  We found no triable issues concerning DeWalt's alleged concealment of project Inca or failure to inform the board or Morgan Stanley about management's synergy discussions with Intel prior to June 2010.  Finally, we concluded that DeWalt's rebuff of James's $50 overture and apparent failure to disclose it to the board or to McAfee's financial advisors did not undermine the board's role as a neutral decisionmaker and was insufficient to cause the standard of review to intensify to entire fairness.  That determination, however, is not dispositive of whether DeWalt may be personally liable for a breach of fiduciary duty. We address that issue here.

Plaintiff contends that DeWalt knowingly concealed James's overture from the board and, what is more, continued the deception when a couple of weeks later, Intel

revised its offer to $48-per-share and communicated that it would go no higher. Defendants deny that DeWalt concealed a $50-per-share "offer" from the board, as James had made it clear that she did not have authorization at that level. Defendants point to James's testimony that DeWalt responded "no, 52 to 54" as evidence that DeWalt handled James's "fishing expedition" negotiating tactic by appropriately trying to get more money for McAfee's stockholders and *not* by selling them out. They argue that plaintiff's inability to explain why DeWalt would have concealed a $50-per-share opportunity when he personally would have gained $6.5 million over the prior offer at $45 per share vitiates plaintiff's claim. (See *In re Answers Corp. S'holders Litig.*, 2014 Del. Ch. LEXIS 17, at *10 [noting on summary judgment that "a plaintiff's inability to explain a [defendant's] motivation to act in bad faith may . . . be relevant in analyzing bad faith claims"].) The trial court agreed with defendants, finding that "DeWalt's refusal cannot be reasonably construed as anything but negotiating for an authorized, higher amount, not an effort to drive McAfee's expectations lower."[16]

Plaintiff argues that this assessment improperly drew inferences in defendants' favor related to DeWalt's motive, even though in analyzing a corporate fiduciary's disloyalty or failure to act in good faith, "[i]t makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation." (*In re Walt Disney Co. Derivative Litigation*, *supra*, 907 A.2d at p. 754.) Plaintiff contends that regardless of motive, DeWalt's failure to report James's overtures to the board and its

---

[16] The trial court explained that plaintiff's argument (that DeWalt rejected James's offer without discussing it with the board or advisors to cause the board to "abandon the price range it had determined to be fair and settle for a lower price") was "difficult to reconcile with Plaintiff's theory that DeWalt's main objective was to facilitate the sale of McAfee. Moreover, it is undisputed that in refusing James's $50 offer, DeWalt sought a higher price in the '$52 to $54' range . . . . Thus, DeWalt's refusal cannot be reasonably construed as anything but negotiating for an authorized, higher amount, not an effort to drive McAfee's expectations lower."

49

advisors, and later to McAfee's shareholders in the proxy statement, represented conscious disregard for his fiduciary duties. Further, to the extent that motive is relevant, Plaintiff contends that DeWalt stood to receive more financially from ensuring that a deal happened, even at a lower price, than if he had risked no deal at all by fighting for a higher price. Plaintiff supports this claim with an expert report by compensation consultant Brian Foley, as well as inferential evidence stemming from DeWalt's historical success in merger transactions prior to McAfee.

We resolve this debate through the lens of enhanced scrutiny review, recalling that it is the directors' burden to prove that they acted reasonably in light of the circumstances at the time. (*Paramount*, *supra*, 637 A.2d at p. 45.) Delaware law treats the obligation to act in good faith not as "an independent fiduciary duty that stands on the same footing as the duties of care and loyalty" but rather as a "condition" of the fundamental duty of loyalty. (*Ritter*, *supra*, 911 A.2d at p. 370.) The Delaware Supreme Court in *Walt Disney* described the duty to act in good faith as a doctrinal vehicle for courts to address fiduciary conduct that "does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence," and therefore "should be proscribed." (*Walt Disney*, *supra*, 906 A.2d at p. 66.) The definition of bad-faith conduct relevant here is " 'where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.' " (*Id.* at p. 67.) Whereas intentional failure to pursue the best interests of the corporation may not require subversive motive (see *In re Walt Disney Co. Derivative Litigation*, *supra*, 907 A.2d at p. 754), evidence of motive may be relevant in determining whether a triable issue of fact exists for a bad faith claim. In particular, when the court employs the enhanced scrutiny standard of review, "the predicate question of what the board's true motivation was comes into play." (*In re Dollar Thrifty S'holder Litig.* (Del. Ch. 2010) 14 A.3d 573, 598 (*Dollar Thrifty*).)

Applying these principles in order to determine whether a triable issue of material fact exists on the subject of DeWalt's response to and subsequent nondisclosure of

James's overture, we find that consideration of motive is inevitable. That is, a reasonable trier of fact could not find that DeWalt " 'intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation' " or " 'intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties' " (*Walt Disney*, *supra*, 906 A.2d at p. 67) if the evidence simultaneously shows that DeWalt acted reasonably in pursuit of the board's aim "to secure the transaction offering the best value reasonably available for" McAfee's shareholders. (*Paramount*, *supra*, 637 A.2d at p. 44.) Just as the duty of loyalty "is not limited to cases involving a financial or other cognizable fiduciary conflict of interest," a director or officer " 'cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.' " (*Ritter*, *supra*, 911 A.2d at p. 370.)

There are two aspects of DeWalt's conduct at issue—the response to James's overture and the subsequent nondisclosure. We find the fact that DeWalt rebuffed James by citing a higher, desired offer price insufficient to support an inference that DeWalt was acting disloyally or in bad faith. We agree with the trial court that DeWalt's rejection of James's negotiation tactic and push for an offer in the $52-54 range cannot be reasonably construed as anything but negotiating for an authorized, higher amount— conduct consistent with the duty to seek the "best value reasonably available for the stockholders." (*Paramount*, *supra*, 637 A.2d at p. 44.) DeWalt's e-mail correspondence with James after the July 4th weekend and her testimony recalling their conversations at several junctures supports this understanding of the record. A contrary interpretation, inferring a motive to undersell McAfee in order to close a deal quickly, is logically inconsistent with the evidence that DeWalt actively sought to justify a higher value to Intel throughout the negotiations.

The court in *Chen*, *supra*, 87 A.3d 648, applied this reasoning in granting summary judgment for several director defendants. The court noted that for enhanced scrutiny review, the fact that the directors were disinterested and independent was "not

51

dispositive, because '[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board.' " (*Id.* at p. 685, quoting *Dollar Thrifty, supra*, 14 A.3d at p. 598.) However, "speculation about motives [wa]s not enough." (*Chen, supra*, at p. 685.) The court found certain evidence that a director had shared confidential information with a potential acquirer to be "one of the more troubling aspects of the case" but concluded that the total mix of evidence did not "support any inference other than an effort" by the director to "maximize the value of his funds' holdings, thereby maximizing value for all common stockholders." (*Ibid.*) The court observed that one "cannot reasonably infer" that the directors acted against their economic interest, nor had the plaintiffs offered "any plausible theory" as to why the directors would have done so. (*Id.* at p. 686.)

DeWalt's failure to disclose the overture to the board and ultimately to the shareholders, however, does not survive the same analysis. The evidence shows that DeWalt did not tell the board or its advisors that about two weeks before Intel made its revised offer at $48 per share, James had probed him about "will 50 get the deal done," if she were to get authorization for that amount from Intel's board.[17] Plaintiff, as the nonmoving party, is entitled to the inference that at the time that James made the overture, she was not merely "fishing" for information about McAfee's "start with a 5" negotiating stance, but was seriously considering a strategy to close a deal with McAfee that included seeking authorization from Intel's board. The e-mails between James and Andy Bryant support this inference.

While there are many plausible explanations for DeWalt not mentioning the overture to the board and its advisors, there is no direct evidence on this point, and any

---

[17] As plaintiff points out, it also appears from the record that James had spoken with DeWalt once prior to the conversation over the July 4th weekend about the possibility of seeking a deal at $50.

resulting inferences appear to be conflicting. (Cf. *Chen*, *supra*, 87 A.3d at p. 687 [denying grant of summary judgment as to two officer defendants, whose actions during the sale process "could support a reasonable inference of favoritism . . . consistent with their personal financial interests rather than the pursuit of maximal value for the stockholders"].) Defendants, as noted earlier, point to the perverse logic of plaintiff's concealment claim, given that a $50-per-share offer would have presented DeWalt with the opportunity to gain many millions of dollars over the prior offer at $45 per share. Plaintiff on the other hand purports to show by its compensation expert's analysis that having been primed for significant personal financial gains in his last company sale, DeWalt had the incentive to close a deal regardless of whether it represented the best possible price for the company and shareholders. Defendants point to evidence that casts doubt unto plaintiff's theory, including that McAfee's independent directors consistently viewed DeWalt as highly capable and committed to the task of securing the best possible value for the company. Yet defendant O'Leary also testified that he would have wanted to know if such a conversation had taken place. Of course, this court does not weigh the evidence or resolve conflicting inferences. We are unable to conclude on the record presented that no triable issue of material fact exists as to the basis for DeWalt's failure to disclose the $50 overture, and whether that failure constituted a breach of his fiduciary duty of good faith or loyalty.

Even if the evidence is insufficient to create a triable issue of material fact as to disloyalty or bad faith, as an officer of the corporation DeWalt is not exculpated from liability for a breach of the duty of care. (§ 102(b)(7); *Chen*, *supra*, 87 A.3d at p. 686.) Breach of the duty of care in this context requires evidence of a process so deficient that it constitutes gross negligence. (*In re Walt Disney Co. Derivative Litigation*, *supra*, 907 A.2d at p. 749.) Delaware corporate law defines gross negligence "as a ' "reckless indifference to or a deliberate disregard of the whole body of stockholders" or actions which are "without the bounds of reason." ' " (*Id.* at p. 750.)

Plaintiff contends that the evidence of DeWalt's conduct "without question" raises potential due care violations. Yet the trial court did not address the due care aspect of plaintiff's claim in its decision granting summary judgment for defendants, and plaintiff presents no specific analysis to support its claim that DeWalt's failure to disclose James's overture breached this standard of fiduciary conduct. On remand, the trier of fact must weigh the evidence relevant to the nondisclosure issue as it relates to DeWalt's alleged breach of fiduciary duty—be it based on bad faith or on an omission that falls outside the bounds of reason.[18]

Plaintiff's disclosure claim against DeWalt also remains at issue. The "essential inquiry" in any disclosure claim is whether the omitted information is material. (*Gantler v. Stephens* (Del. 2009) 965 A.2d 695, 710.) "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." (*Arnold*, *supra*, 650 A.2d at p. 1277, emphasis omitted.) It requires the plaintiff to show "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder" because, if disclosed, the omitted fact would have "significantly altered the 'total mix' of information made available." (*Ibid.*, emphasis omitted.)

---

[18] We note that on remand, if the trial court finds it impossible to separate actions taken by DeWalt in fulfillment of his directorial duties from actions taken in fulfillment of his duties as CEO, the duty of care claim against DeWalt must be exculpated pursuant to the section 102(b)(7) provision. (See *Arnold*, *supra*, 650 A.2d at p. 1288 ["where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)"].) In *Arnold*, the Delaware Supreme Court rejected the plaintiff's contention on cross-motions for summary judgment that a disclosure violation by the defendant, who was a director and officer of the corporation, fell outside the scope of protection of the section 102(b)(7) exculpatory provision, because "plaintiff has failed to highlight any specific actions [the CEO] undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to Section 102(b)(7)." (*Arnold*, *supra*, at p. 1288.)

Defendants argue that the proxy statement disclosed all material facts concerning the June 11 proposal and subsequent negotiations, including that DeWalt told James that the McAfee board "would not be interested in accepting an offer price below $50.00 per share," and that James indicated that Intel's board "would not support an offer price of $50.00 per share."[19]  Defendants also point out that Delaware Law does not require directors to disclose every detail of negotiations (*In re Micromet*, *Inc*., *S'holders Litig*., 2002 Del. Ch. LEXIS 41, at *34-35) and recognizes that there always will be additional details that could have been disclosed in the proxy statement.  Indeed, "[s]o long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment."  (*In re 3Com S'holders Litig*., 2009 Del. Ch. LEXIS 215, at *4.)

Yet in this case there is no evidence that the omission of James's overture to DeWalt from the proxy statement was the product of reasoned business judgment, because DeWalt never disclosed the interaction to the board or its advisors.  This stands in contrast with circumstances that Delaware courts have found to fall appropriately within the range of reasonableness required under enhanced scrutiny.  For example, in *Dollar Thrifty*, the plaintiffs alleged that the Dollar Thrifty board failed to reach out to a potential suitor (Avis) before finalizing the merger transaction with Hertz, and specifically alleged that Dollar Thrifty's CEO lied about his reasons for turning down a dinner invitation from the Avis CEO even though he had "suspicions" that perhaps the

---

[19] Plaintiff complains that defendants cite to nothing more than the proxy statement in support of the assertion that Intel's board would not support an offer at $50 per share.  Plaintiff fails to recognize other evidence in the record that supports this paragraph of the proxy statement, including an e-mail from James to Andy Bryant on June 30, 2010, in which she confirmed, "they get that we weren't going to get to or near 50 last week—Dave has not been willing to affirm other than he would work to get his board to say 'they would do 50' . . . and we know some of the board is at 52-55 . . . ."

CEO wanted to talk about "a deal." (*Dollar Thrifty*, *supra*, 14 A.3d at p. 606.) In ultimately rejecting the plaintiff's theory as highly conspiratorial, the Court of Chancery noted that the CEO had informed the board and its financial advisors about the dinner invitation and "had no possible sinister motive" in deciding to forego it. (*Ibid.*) Here, the trial court made no finding about whether DeWalt's apparent nondisclosure was material, and unlike the CEO in *Dollar Thrifty*, DeWalt apparently did not inform the board of James's inquiry at all. Viewing all evidence in the light most favorable to plaintiff, we cannot say as a matter of law that shareholders weighing a $48-per-share offer would have considered it unimportant to the "total mix of information" to know that Intel had raised the prospect of an offer at $50 per share two weeks earlier—even if that potential never materialized or proved to be no more than a fishing expedition.

To summarize, we find that plaintiff has raised one or more triable issues of material fact related to DeWalt's apparent nondisclosure of arguably material information about James's $50-per-share overture. Even if the evidence at the time that Intel made its revised offer at $48 per share showed that it was Intel's best and final offer (see *ante*, section II.C.2.a), conflicting inferences emerge as to why DeWalt did not mention James's probing inquiry two weeks earlier. DeWalt bears the burden under the enhanced scrutiny standard of review to show that he exercised his fiduciary duties in furtherance of the obligation "to secure the transaction offering the best value reasonably available for the stockholders . . . ." (*Paramount*, *supra*, 637 A.2d at p. 44.) The trial court's grant of summary judgment in favor of DeWalt must be reversed.

### 3. *Aiding and Abetting*

Plaintiff's complaint asserted a single cause of action for breach of fiduciary duties and aiding and abetting and identified McAfee and Intel each as "an aider and abettor" to the conduct alleged. A claim for aiding and abetting a breach of fiduciary duty requires proof of: "(1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; (3) knowing participation in the breach by a defendant who is not a fiduciary; and

56

(4) damages proximately caused by the breach." (*Transkaryotic*, *supra*, 954 A.2d at p. 370.)

Defendants correctly point out that aiding and abetting liability requires an underlying breach of duty. (See *Manzo v. Rite Aid Corp.*, 2002 Del. Ch. LEXIS 147, at *21.) Thus in *Transkaryotic*, the plaintiffs alleged that the acquiring company, Shire, " 'knowingly assisted' " the individual defendants in breaching duties of loyalty and disclosure. (*Transkaryotic*, *supra*, 954 A.2d at p. 370.) The Court of Chancery granted summary judgment in favor of several of the individual defendants, and accordingly granted summary judgment for Shire with respect to those defendants. The court explained, "Shire cannot aid or abet a breach that does not exist." (*Id*. at p. 371.) As to the remaining individual defendant, the court reasoned that it "must assume" disloyalty for purposes of analyzing the related aiding and abetting claim: "I here consider only whether Shire knowingly participated in the assumptive breach of duty of loyalty by [the individual defendant] and, if so, whether that concerted action proximately caused damage to plaintiffs." (*Ibid*.) In that case, the court found that the plaintiffs had proffered evidence that was adequate to demonstrate a triable issue of material fact as to Shire's knowing participation, as well as resultant damages. (*Id*. at pp. 372-373.)

Here, the sole basis for defendants' motion on the aiding and abetting claim, and the basis on which the trial court granted summary judgment in favor of defendants McAfee and Intel, was the claimed absence of an underlying breach of duty. By relying entirely on the theory that plaintiffs could not demonstrate a triable issue on *any* breach of fiduciary duty claim, defendants have failed to meet their initial burden to show that one or more elements of the aiding and abetting cause of action cannot be established (§ 437c, subd. (p)(2)) with respect to an assumed breach by DeWalt. Since we conclude that triable issues remain as to the fiduciary duty and disclosure claim against DeWalt, the trial court's determination that McAfee and Intel cannot be liable for aiding and abetting must be reversed.

**D. JURY TRIAL**

Plaintiff contends that the trial court improperly denied its right to a jury trial under the California Constitution. (Cal. Const. art. I, § 16.) According to plaintiff, its claim for breach of fiduciary duty and aiding and abetting should be characterized as an action at law rather than in equity because (1) the relief sought is legal (damages), (2) California law characterizes the relationship between shareholders and the directors and officers of a corporation as legal in nature, and (3) model jury instructions envision jury trials on breach of fiduciary duty claims. Defendants respond that the matter is properly tried to the court without a jury because plaintiff's breach of fiduciary duty claims are equitable in nature. Both sides cite California law governing the right to a jury trial but disagree about whether California or Delaware law should apply in determining the nature of the action.

Under California law, " '[t]he jury trial is a matter of right in a civil action at law, but not in equity.' " (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8 (*C & K Engineering*).) In determining whether the action is one triable by a jury at common law, the court looks to " 'the nature of the rights involved and the facts of the particular case—the gist of the action.' " (*Wisden v. Superior Court* (2004) 124 Cal.App.4th 750, 755; accord *C & K Engineering*, *supra*, at p. 9.) A jury trial must be granted where the gist of the action is legal; but "if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial." (*C & K Engineering*, *supra*, at p. 9.) On appeal we review de novo whether a party was constitutionally entitled to a jury trial. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 23.) In case of doubt, the issue "should be resolved in favor of preserving a litigant's right to trial by jury." (*Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654; accord *Interactive Multimedia Artists, Inc. v. Superior Court* (1998) 62 Cal.App.4th 1546, 1551 (*Interactive Multimedia*).)

The California Supreme Court reiterated these principles in a decision addressing in relevant part the right to a jury trial on a cause of action for wrongful termination in violation of public policy. (*Shaw v. Superior Court* (2017) 2 Cal.5th 983 (*Shaw*).) *Shaw* summarized the constitutional right to a jury trial in California as follows. "Article I, section 16 of the California Constitution declares broadly that '[t]rial by jury is an inviolate right and shall be secured to all . . . .' Notwithstanding the breadth of this declaration, past California cases make clear 'that the state constitutional right to a jury trial "is the right as it existed at common law in 1850, when the [California] Constitution was first adopted." ' " (*Id*. at pp. 994-995, fn. omitted.) Thus, " ' " '[i]f the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law.' " [Citation.] On the other hand, if the action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial. [Citations.] Although we have said that "the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded" [citation], the prayer for relief in a particular case is not conclusive [citations]. Thus, "The fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . ." ' " (*Id*. at p. 995.)

As set forth in the Restatement (Second) Conflict of Laws section 122, "A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case." (Rest.2d Conf. of Laws, § 122, com. a, p. 350.) This includes the "form of the action"— (*id*., § 124) whether a claim is at law or in equity, and the "mode of trial"— (*id*., § 129) whether an action is tried to a jury or to a judge. (Accord *Interactive Multimedia*, *supra*,

62 Cal.App.4th at p. 1551; see also *Cobb v. Lawrence* (1942) 54 Cal.App.2d 630, 633 ["the law of the forum determines whether an issue of fact shall be tried by the court or by a jury"]; 3 Witkin, Cal. Procedure (2008) Actions, § 46.) Stated in terms of substance and procedure,[20] "courts generally enforce the substantive rights created by the laws of other jurisdictions, [but] the procedural matters are governed by the law of the forum." (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012.)

In arguing that Delaware law determines the nature of the action, defendants misapprehend the reach of the internal affairs doctrine, which pertains to the substantive law governing the outcome of the litigation—specifically to provide " 'the relevant corporate governance general standard of care' " based on the state of a businesses' incorporation. (*State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442.) As the court explained, " 'The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .' " (*Ibid.*) While Delaware law in this case supplies the " 'relevant corporate governance general standard of care' " (*ibid.*), we find no basis on which to extend the internal affairs doctrine to matters properly governed by local forum rules, including form of the action (equitable or legal) and mode of trial (jury or bench).

The question thus narrowed is whether plaintiff's shareholder class action for breach of fiduciary duty, brought under Delaware law, is legal or equitable in nature under California law. Plaintiff emphasizes that the relief sought in this case is legal because the complaint sought money damages for defendants' breach of fiduciary duty and withholding of material information. Specifically, plaintiff sought: (1) "damages to

---

[20] The Restatement has discarded the approach of classifying issues as substantive or procedural. (Rest.2d Conf. of Laws, § 122, com. b, p. 352.)

the class in an amount to be proven at trial, caused by defendants' breaches of fiduciary duties in connection with the Acquisition," (2) rescission of "the Merger Agreement or any of the terms thereof, and the Acquisition," and (3) "such other and further equitable relief as this Court may deem just and proper."

We note that the prayer for relief, though not conclusive, is weighted toward equitable remedies. Notably, the pleading for damages is tied to the conduct of McAfee's former directors "in connection with the Acquisition," which according to the complaint allegations was inherently unfair to the McAfee shareholders due to defendants' alleged breaches of fiduciary duty and self-serving conduct. Although "[d]amages are a remedy *at law*" (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396), the " ' "nature of the rights involved" ' " (*C & K Engineering*, *supra*, 23 Cal.3d at p. 9) in a shareholder breach of fiduciary duty action against the corporate directors is generally viewed as a determination of rights in equity. " 'Where a breach of fiduciary duty occurs, a variety of equitable remedies are available, including imposition of a constructive trust, rescission, and restitution, as well as incidental damages.' " (*Meister v. Mensinger*, *supra*, at p. 396.)

*Interactive Multimedia*, *supra*, 62 Cal.App.4th at page 1556, which concluded that a shareholder action for breach of fiduciary duty was equitable and the plaintiff was not entitled to a jury trial, illustrates this point. In that case, a minority shareholder sued the majority shareholder and two directors after the company merged into a new corporation, designating to the minority what it alleged was "less than the fair value of its interest . . . ." (*Id*. at p. 1549.) The court examined the action, which sought monetary damages, under both Delaware and California law, and explained in applying California law that its "gist" was equitable: "The fiduciary duty of a controlling shareholder or director to a minority shareholder is based on 'powers in trust' "—a power that " ' " 'is at all times subject to the *equitable* limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary . . . .' " ' " (*Id*. at p. 1555,

61

quoting *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 109.) The court observed that "[t]rust relationships are premised on equitable principles" (*Interactive Multimedia*, *supra*, at p. 1555) and noted that the " 'entire fairness' " analysis under Delaware law also requires the application of equitable principles, because the court is "weighing various considerations in order to reach a just result." (*Id.* at p. 1556.)

Plaintiff's effort to distinguish *Interactive Multimedia* as a dispute between minority and majority shareholders, rather than between shareholders and the board of directors, is unavailing. The fiduciary duty action implicated directors of the former corporation as well as the majority shareholder, and the court's ruling applied to both. (*Interactive Multimedia*, *supra*, 62 Cal.App.4th at p. 1555.)

Plaintiff also seeks to refute or limit the principle articulated in *Interactive Multimedia* by arguing that the relationship between shareholders and the directors of a corporation is not one of trust but of agency. Plaintiff relies on the following passage from *Bainbridge v. Stoner* (1940) 16 Cal.2d 423, 428 (*Bainbridge*): "strictly speaking, the relationship [between a director of a corporation and its stockholders] is not one of trust, but of agency . . . ." Plaintiff contends that unlike claims based on "trust," fiduciary claims based on an "agency" relationship under California law are legal in nature and entitle the litigant to a trial before a jury.

We are not persuaded that our high court's statement in *Bainbridge* has direct application here.[21] The issue in *Bainbridge* was whether stockholders of a mining

---

[21] The complete statement in *Bainbridge* reads: "One who is a director of a corporation acts in a fiduciary capacity, and the law does not allow him to secure any personal advantage as against the corporation or its stockholders. [Citations.] However, strictly speaking, the relationship is not one of trust, but of agency, although it has been held that a director must comply with the requirements of section 2230 of the Civil Code relating to trustees. [Citations.] But having no title to the property in his charge, [the director] was not an express trustee of it as a director or officer of the corporation." (*Bainbridge*, *supra*, 16 Cal.2d at pp. 427-428.) The court concluded that the director's alleged acquisition of title to certain corporate property "in defiance of the rights of the
(continued)

company had stated a cause of action to have the company's president and director (hereafter "director") declared a trustee of certain mining claims after he allegedly acquired title to corporate property and used it for his personal gain. (*Bainbridge*, *supra*, 16 Cal.2d at pp. 428-429.) The court held that the director was not an express or resulting trustee of the property, but a constructive trustee. (*Bainbridge*, *supra*, at pp. 428-429.) The discussion of "trust" versus "agency" in *Bainbridge* must be understood in context; *Bainbridge* did not address whether an action for breach of fiduciary duty arises from legal or equitable principles. Indeed, *Bainbridge* appears to reflect the fact that corporate directors and officers are not "trustees" in the technical sense. (See *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 345 [" 'Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders.' "].)

Similarly in *In re Cantrell* (9th Cir. 2003) 329 F.3d 1119, 1126, the Ninth Circuit rejected the argument under California law that corporate "officers are trustees of a statutory trust with respect to corporate assets." The court addressed *Interactive Multimedia* in a footnote by noting that the Court of Appeal had "failed to mention the California Supreme Court's holding in *Bainbridge*" and likely had not "intended to contradict the state's highest court without expressly doing so." (*In re Cantrell*, *supra*, at p. 1126, fn. 4.) While it is true that *Interactive Multimedia* did not mention *Bainbridge*, it did rely on another, more recent California Supreme Court case. Specifically, the analysis of the fiduciary duty action in *Interactive Multimedia* came directly from *Jones v. H.F. Ahmanson & Co.*, *supra*, 1 Cal.3d at page 109, and its statement about " 'powers

corporation and its stockholders" made him a constructive trustee for the corporation and its stockholders (*id.* at p. 429)—a theory "adopted by equity as a remedy to compel one to restore property to which he is not justly entitled, to another." (*Id.* at p. 428.)

in trust' " can be traced to the United States Supreme Court's decision in *Pepper v. Litton* (1939) 308 U.S. 295, 306. That case concerned the equitable powers of the bankruptcy courts and summarized "certain cardinal principles of equity jurisprudence. A director is a fiduciary. . . . So is a dominant or controlling stockholder or group of stockholders. . . . Their powers are powers in trust. . . . Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." (*Ibid*.)

Even accepting the relationship between corporate directors and shareholders as an agency relationship in the circumstances discussed in *Bainbridge* does not resolve how this shareholder action for breach of fiduciary duty should be viewed, as between an action cognizable at law or in equity. (See *C & K Engineering*, *supra*, 23 Cal.3d at p. 8 [the constitutional right to a jury trial is "the right as it existed at common law in 1850, when the Constitution was first adopted, 'and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact' "].) We find, for this purpose, that the analysis in *Interactive Multimedia* is sound.[22]

---

[22] Furthermore, to the extent that we look to whether " ' " 'the action has to deal with ordinary common-law rights cognizable in courts of law' " ' " (*Shaw*, *supra*, 2 Cal.5th at p. 995), a brief foray into earlier California cases suggests that shareholder claims against corporate directors (sometimes referred to as "trustees") or officers were brought in the courts of equity. In *Wright v. Oroville M. Co.* (1870) 40 Cal. 20, the court addressed whether a stockholder could compel the company to refund the amount paid by him for the redemption of corporate property which the directors had allowed to be sold and wrongfully neglected to redeem. The court explained that "[t]he trustees and officers of the corporation are only the agents through whom [the corporation] manages and conducts its business. The stockholders are the *cestui que trust*." (*Id*. at p. 22.) The court continued that "the Courts of equity, in dealing with the relations between the corporations and [its] officers upon the one hand, and the stockholders upon the other, in the management of the corporate affairs, . . . inquire if the authority has been, in good (continued)

64

Plaintiff's other arguments do not alter this assessment.  While plaintiff has not alleged diversion of corporate funds or sought an accounting, the "gist" of plaintiff's action is consistent with the court's summary in *Interactive Multimedia* of a claim based on conduct that allegedly violated the " ' " '*equitable* limitation' " ' " that the corporate fiduciary may not exercise power for his own " ' " 'aggrandizement, preference, or advantage . . . .' " ' " (*Interactive Multimedia*, *supra*, 62 Cal.App.4th at p. 1555.)  As discussed, it is the gist or nature of the action that determines whether a jury trial is available as a matter of right.  (*C & K Engineering*, *supra*, 23 Cal.3d at pp. 5, 10 [concluding that because the suit for damages for breach of contract was based entirely upon the equitable doctrine of promissory estoppel, the action was equitable in nature and neither party was entitled to a jury trial as a matter of right]; accord *Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 863-865 [damages sought for breach of fiduciary duty and fraud causes of action did not entitle plaintiffs to jury trial, because assessing

faith, exercised to promote the interest of the stockholders." (*Id*. at p. 27; accord *Ashton v. Dashaway Association* (1890) 84 Cal. 61, 68.)

That these are equitable principles also appears in a case from 1860, *Neall v. Hill* (1860) 16 Cal. 145 (*Neall*).  The plaintiff was a stockholder who alleged "various acts of fraud and mismanagement" by the corporation and four directors.  (*Id*. at p. 148.)  Certain issues of equity jurisdiction were raised in the appeal, leading the high court to pronounce that "[t]here is *no doubt that in the present case the Court had jurisdiction to compel the officers of the corporation to account for any breach of trust . . . .*" (*Id*. at p. 150, italics added.)  Citing earlier precedent, the court noted " 'that the persons who, from time to time, exercise the corporate powers, may, in their character of trustees, be accountable in this Court for a fraudulent breach of trust, and to this plain and ordinary head of equity the jurisdiction of this Court over corporations ought to be confined.' " (*Ibid*.)  The court found the allegations in *Neall* entitled the plaintiff to an accounting, but emphasized that liability for any alleged diminution in the value of the stock "should only be enforced in a very clear case, and where the loss has been occasioned by gross negligence or willful misconduct." (*Id*. at pp. 150-151.)

These cases suggest that in addressing alleged breaches of duty by corporate fiduciaries, the courts of equity were not confined to remedies like an accounting but could compensate for "any loss occasioned by [the directors'] negligence or improper conduct." (*Neall*, *supra*, 16 Cal. at p. 151.)

damages required application of equitable principles]; see also *Shaw*, *supra*, 2 Cal.5th at p. 1000, fn. 16 [statutory provision at issue did not afford a right to a jury trial with respect to legal remedies, since "under the statute the amount of damages to be awarded will necessarily depend upon the nature of the equitable remedies that are to be imposed"].) Nor does the existence of a model jury instruction for breach of fiduciary duty[23] create authority for plaintiff's right to a jury trial here. (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7 ["jury instructions, whether published or not, . . . are not authority to establish legal propositions or precedent"].)

We conclude, based on the nature of the allegations and relief sought in this case,[24] that the trial court properly treated the action as equitable in nature, to be tried by the court.

## III. DISPOSITION

The judgment is affirmed as to defendants Charles Robel, Carl Bass, Thomas Darcy, Leslie Denend, Jeffrey Miller, Lorrie Norrington, Denis O'Leary, Robert Pangia, and Anthony Zingale.

The judgment is reversed as to defendants David DeWalt, McAfee, Inc., and Intel Corporation.

Each side shall bear its own costs on appeal.

---

[23] See Judicial Council of California Civil Jury Instruction Nos. 4100 through 4102. The referenced model instructions' "Directions for Use" expressly assume that the plaintiff is bringing a legal cause of action, not an action in equity.

[24] We recognize that our conclusion does not foreclose the right to a jury trial in all or other shareholder actions against corporate fiduciaries, which may invoke different factual scenarios or allegations that are cognizable at law.

_____
                                        Premo, J.

WE CONCUR:

_____
        Rushing, P.J.

_____
        Walsh, J.[*]

Central Laborers' Pension Fund v. McAfee, Inc. et al.
H039508

---

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| Trial Court: | Santa Clara County Superior Court Superior Court Nos. CV180413, CV180420, CV180597, CV180928 |
|---|---|
| Trial Judge: | Hon. James P. Kleinberg |
| Counsel for Plaintiff/Appellant: Central Laborers' Pension Fund | Robbins Geller Rudman & Dowd Rick Atwood, Jr. Randall J. Baron Maxwell R. Huffman |
| Counsel for Defendants/Respondents: McAfee, Inc. Intel Corporation | Gibson, Dunn & Crutcher Paul J. Collins Mark A. Perry Wayne W. Smith Thomas G. Hungar Linda D. Lam Casey J. McCracken |
| Counsel for Defendants/Respondents: David DeWalt Thomas E. Darcy Denis J. O'Leary Robert W. Pangia Carl Bass Jeffrey A. Miller Anthony Zingale Leslie G. Denend Lorrie M. Norrington Charles J. Robel | Wilson Sonsini Rodney G. Strickland Boris Feldman |

Central Laborers' Pension Fund v. McAfee, Inc. et al.
H039508